## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GARRETT MASON LEE, by and through his Guardian, Conservator, and Next Friend, SHAYNE LEE, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION FILE |
| FULTON COUNTY SCHOOL DISTRICT, MELANIE PICKENS, FRANCES BOYD, PAULA MERRITT, VICKI DENMARK, RALPH LYNCH, JAMES WILSON, RONNIE WADE, STEPHANIE SCHUETTE, HARVEY BEASLEY, WILLIAM THOMPSON, NANCY WADEL, DOROTHY PETTES, NANCY SHELLEY, DONNA FAULKNER, EMMETT SHAFFER, STEPHANIE SOSEBEE, STACY WHITE, TEMPLYN AVERETT, KENNETH McGEE, CYNTHIA KANNER, MICHAEL VANAIRSDALE, J. RANDALL REECE, LANCE YOUNG, SHARON BUTLER, SARA WARE, SHARON ETRIS, and SARA BIEGELSON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | NO. <u>1:14-cv-1399-CAP</u>

<u>**JURY TRIAL REQUESTED**</u> |
| Defendants. | ) ) | |

## COMPLAINT

COMES NOW Plaintiff Garrett Lee Mason (hereinafter referred to as "Garrett"), by and through his court appointed Guardian and Conservator and Next Friend, Shayne Lee, and files this Complaint, stating as follows:

## PARTIES

### 1.

Plaintiff Garrett is a disabled individual who from birth has had and continues to have Fragile X Syndrome, mental retardation, and autism spectrum disorder.

### 2.

Before Garrett suffered severe and ongoing abuse[1] from August 2004 to May 2007 in the Fulton County School District (hereinafter referred to as "FCSD"), he was a happy, social child who was learning and making progress, but all that changed after he was abused.  FCSD and other Defendants named herein intentionally and maliciously placed Garrett with Defendant Melanie Pickens (hereinafter referred to as "Pickens"), a known child abuser and teacher employed by FCSD, and Garrett was violently and inhumanely abused for three school years, and he has suffered and continues to suffer due to the collective and concerted intentional, malicious, bad faith actions of all Defendants named herein.

---

[1] As used herein, the term "abuse" and any form thereof (i.e., abusing, abused, abusive) means any one or more of the following: hitting, slapping, yanking around, pushing, pushing down, screaming at, yelling at, cursing, name calling, throwing things at, kicking, kneeing, pushing into a locker, pushing into a wall, shoving, shoving into a wall, shoving into a locker, jacking up (which means to push a child face first into a wall or locker and lift the child up, sometimes with the child's feet coming off the ground), intentionally upsetting a child so the child self injures and/or cries and screams, putting buttocks in a child's face, putting breasts in a child's face, rubbing buttocks in a child's face, rubbing breasts into a child's face, passing gas on a child, passing gas in a child's face, allowing a child to rub an adult's buttocks or breast, abandoning a child, restraining a child to a chair, restraining a child to a chair and abandoning the child in a room without an adult, depriving of food, throwing a child down on a wedge, throwing a child into a wheelchair, spraying Lysol on a child, as well as pulling a child's ear or a child's hair.

3.

Plaintiff Garrett Lee has been legally incompetent because of mental retardation since before August 2004 and has remained legally incompetent because of mental retardation.

4.

Garrett Lee resides in Fulton County, Georgia.

5.

All Defendants other than the FCSD were required by their certification as educators with the Georgia Professional Standards Commission (hereinafter referred to as "GaPSC") pursuant to the GaPSC Code of Ethics to not commit any act of child abuse, including physical and verbal abuse; not commit any act of cruelty to a child or any act of child endangerment; not commit any sexual act with a student or solicit such from a student; not engage in harassment or misconduct toward a student that would violate state or federal law; and to file a report of a breach of one or more of these ethical requirements and to file a report of child abuse pursuant to O.C.G.A. § 19-7-5.

6.

Defendant FCSD is a public corporate body and a county political subdivision operating in Fulton County, Georgia and has the capacity to be

sued.  FCSD allowed, orchestrated, facilitated, ensured, aided, promoted, ratified, and covered up the malicious and violent physical, verbal, sexual, and emotional abuse of Garrett, causing Garrett severe harm and lifelong damage.  FCSD, along with all Defendants herein, through FCSD's policies, procedures, and customs, violated the clear laws of the State of Georgia and the United States and the civil, statutory, and constitutional rights of Garrett as set forth herein.  From at least the time Garrett attended FCSD to the present date, FCSD has received federal funds and still does.

7.

Defendant Melanie Pickens (hereafter referred to as "Pickens") is a resident of Fulton County, Georgia, and she resides at 9165 Nesbitt Ferry Road, Unit 36, Alpharetta, Georgia  30022.  Pickens was hired by FCSD to teach disabled children with moderate, severe, or profound mental impairment from 2002 to 2007, and during that time, with FCSD's and other named Defendants' knowledge and support, she severely abused, in two different FSCD middle schools and at least one FCSD elementary school, those disabled children, including Garrett, whom Pickens cruelly and shockingly abused from August 2004 to May 2007, and because of this abuse, Garrett has been severely harmed and irreparably damaged.

8.

Defendant Frances M. Boyd (hereinafter referred to as "Boyd") is a resident of Charleston County, South Carolina and resides at 5 Greensward Road, Johns Island, South Carolina 29455. Boyd was the principal of Hopewell Middle School (hereinafter referred to as "Hopewell") from some time in 2004 to some time in 2007, and during that time. Boyd was informed that Pickens abused disabled children in the FCSD before Pickens came to Hopewell, and Boyd was repeatedly and consistently informed by many different subordinates that Pickens abused disabled children at Hopewell beginning in 2004 and continuing until and through May 2007. While Pickens was at Hopewell, Boyd allowed, facilitated, endorsed, aided, promoted, and covered up Pickens' abuse of disabled children, including the abuse of Garrett.

9.

Defendant Paula Merritt (hereinafter referred to as "Merritt") is a resident of Cherokee County, Georgia and resides at 315 Westbridge Lane, Canton, Georgia 30114. Merritt was an employee of FCSD and was a FCSD instructional support teacher (hereinafter referred to as "IST") of special education at Hopewell from 2004 to 2007. During that time, Merritt was informed numerous and repeated times by many subordinates from

2004 to 2007 that Pickens abused disabled children at Hopewell.  Merritt

allowed, facilitated, promoted, aided, endorsed, and covered up the abuse of

disabled children by Pickens, including the abuse of Garrett.

<div align="center">10.</div>

Defendant Vicki Denmark (hereinafter referred to as "Denmark") is a

resident of Gwinnett County, Georgia and resides at 5614 Covena Court,

Norcross, Georgia 30092.  Denmark was a FCSD area superintendent with

supervisory responsibilities over Hopewell and Hopewell staff.  Denmark

was informed in 2004 that Pickens had physically abused one or more

disabled children, and Denmark took no action to report, prevent, or stop the

abuse and harm of disabled children but instead was one of the FCSD

administrators who acted in concert with other Defendants and decided

Pickens should not be fired and that Boyd should not mention Pickens'

abuse of disabled students in Pickens' upcoming teacher evaluation and

should not place Pickens on a formal corrective educator plan.  Denmark

aided, facilitated, promoted, allowed, and covered up Pickens' abuse of

disabled children and allowed it to continue for years.

<div align="center">11.</div>

Defendant Ralph Lynch (hereinafter referred to as "Lynch") was the

FCSD superintendent of secondary personnel during some part of 2004 if

<div align="center">6</div>

not all of 2004, and when Lynch was informed in 2004 by Boyd and perhaps others that a FCSD nurse reported in writing that Pickens was abusing disabled children, Lynch informed Boyd she was not to report the matter to DFACS, the FCSD police, or any other criminal investigative body and that Boyd was not to give Pickens a "Needs Improvement" on her next teacher evaluation or place Pickens on a formal educator improvement plan.  At that time, Lynch was not even licensed by the GaPSC to be in educational leadership, but he was a GaPSC licensed educator in health and physical education.  Lynch allowed, aided, facilitated, endorsed, and covered up Pickens' abuse of disabled children.

<div align="center">12.</div>

Defendant James Wilson (hereinafter referred to as "Wilson") was the FCSD superintendent from some time in 2005 to some time in 2008, and during that time, Wilson was a GaPSC licensed educator.  Wilson learned and was informed of Pickens' severe abuse of numerous disabled children with moderate, severe, or profound mental impairment and took actions to ensure Pickens continued to abuse disabled children and that the abuse was not reported to the abused children's parents, the GaPSC, DFACS, or any criminal investigative authorities, except he permitted one incident of abuse of one child, Jake Marshall, on one day in May 2007 to be reported to

DFACS and the GaPSC, but not to any criminal investigate agencies, including the FCSD police.  Wilson allowed, aided, facilitated, endorsed, and covered up Pickens' abuse of disabled children.

13.

Defendant Ronnie Wade, who is also called or known as "Ron Wade," (hereinafter referred to as "Wade") is a resident of Fulton County, Georgia and resides at 4502 Mystique Way NE, Roswell, Georgia  30075. Wade was the FCSD coordinator in 2004, an assistant superintendent in 2005, and has been the FCSD chief human resource officer since at least 2006.   Wade took actions to ensure that Pickens continued to abuse disabled children, including Garrett, and that Pickens' abuse of disabled children was facilitated, allowed, promoted, aided, and covered up.

14.

Defendant Stephanie Schuette (hereinafter referred to as "Schuette") is a resident of Fulton County, Georgia and resides at 575 Kings Grant Walk in Roswell, Georgia  30075.  Schuette, a FCSD social worker since 1998, investigated in 2004 abuse by Pickens of Jake Marshall and other disabled students at Hopewell, and at that time, Schuette took actions and did not take actions to ensure Pickens was not reported to the GaPSC, DFACS, the FCSD police, or any other investigative body, and she took actions and did

8

not take actions to ensure parents of the disabled children were not informed at all or the abuse or not correctly informed in Jake's case.  Schuette ensured, allowed, facilitated, promoted, aided, and covered up Pickens' abuse of disabled children, including Garrett.

15.

Defendant Harvey Beasley (hereinafter referred to as "Beasley") is a resident of DeKalb County, Georgia and resides at 2321 Crestknoll Circle, Decatur, Georgia 30032.  Beasley was the director of FCSD social work services in 2004 and still is, and when he was informed of the abuse by Pickens of disabled students at Hopewell in 2004, Beasley took actions and did not take necessary actions in order to ensure Pickens continued to abuse disabled children and to ensure parents of the disabled children were not being informed at all of the abuse or otherwise were not properly informed. Beasley also ensured DFACS, the FCSD police, other criminal investigative agencies, GaPSC, and parents were not informed of Pickens' abuse and that the abuse continued for years.  Beasley allowed, aided, facilitated, endorsed, and covered Pickens' abuse of disabled children, including Garrett.

16.

Defendant William Thompson, also called "Bill Thompson," (hereinafter referred to as "Thompson") was an assistant principal at

Hopewell during the time Pickens abused Garrett and other disabled children at Hopewell from 2004 to 2007, and Thompson was informed of the allegations of Pickens' abuse of disabled children beginning in 2004 and throughout the time he and Pickens were at Hopewell, but Thompson did not report Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the abused disabled children's parents. Instead, Thompson gave Pickens a positive teacher evaluation report in 2007, writing "We appreciate all that you do for your very special students." Thompson also failed to cooperate with the FCSD November 2004 department investigation of Pickens' abuse of disabled children at Hopewell. Thompson allowed, aided, facilitated, endorsed, and covered up Pickens' abuse of disabled children, including Garrett.

17.

Defendant Nancy Wadel (hereinafter referred to as "Wadel") was the FCSD Executive Director of Services for Exceptional Children from some time in June 2004 to some time after 2007. Wadel was informed by Pettes of Pickens' abusive actions beginning in 2004, and Pettes continued to inform Wadel of Pickens' abuse of disabled children until 2007 or thereafter. Wadel never reported Pickens' abuse of disabled children to the GaPSC, DFACS, FCSD police, or any other criminal investigative agency, and she

never told the parents of the abused disabled children that they had been abused.  Wadel allowed, aided, facilitated, endorsed, and covered up Pickens' abuse of disabled children, including Garrett.

18.

Defendant Dorothy Pettes, also called "Dottie Pettes," (hereinafter referred to as "Pettes") is a resident of Fulton County, Georgia and resides at 1106 New Haven Way, Roswell, Georgia  30075.  Pettes was a FCSD Special Education Coordinator from 1998 to either December 2012 or January 2013.  Pettes was informed numerous and multiple times by many different subordinates from 2002 to 2007 that Pickens was abusing disabled children, and Pettes discussed Pickens' abuse with numerous other Defendants named herein, yet Pettes never stopped the abuse, never reported it to DFACS, the FCSD police, any other investigative authority, the GaPSC, or the parents of the disabled children abused.  Pettes ensured, facilitated, promoted, allowed, and covered up Pickens' horrific and ongoing abuse of disabled children for years, including Garrett.

19.

Defendant Nancy Shelley (hereinafter referred to as "Shelley") is a resident of Cobb County, Georgia and resides at 880 Randall Court NW, Marietta, Georgia  30064.  Shelley was the FCSD Executive Director for

Exceptional Children from at least August 2002 to June 2004, and during that time, Shelley was informed of Pickens' abuse of disabled students during the 2002-2003 or 2003-2004 school year or both, and Shelley did not report Pickens' abuse to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the abused disabled children's parents. Shelley allowed, promoted, facilitated, aided, and covered up Pickens' abuse disabled of children for years.

20.

Defendant Donna Faulkner (hereinafter referred to as "Faulkner") is a resident of Gwinnett County, Georgia and resides at 2998 Stockbridge Way, Dacula, Georgia  30019.  Faulkner was the FCSD area IST over Holcomb Bridge Middle School (hereinafter referred to as "Holcomb Bridge") during the 2002-2003 and the 2003-2004 school year, and during that time, Faulkner was informed of Pickens' abuse of disabled children at Holcomb Bridge and did not report Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police department, any other criminal investigative agency, or the disabled children's parents.  Faulkner allowed, facilitated, promoted, aided, and covered up Pickens' abuse of disabled children for many years.

21.

Defendant Emmett Shaffer (hereinafter referred to as "Shaffer") is a resident of Fulton County, Georgia and resides at 300 Lirac Court, Johns Creek, Georgia  30022.  During the 2002-2003 and the 2003-2004 school years, Shaffer was the FCSD principal of Holcomb Bridge, and during that time, he was informed that Pickens had abused disabled children at Holcomb Bridge, and Shaffer did not report Pickens' abuse to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the abused disabled children's parents.  Instead, Shaffer accepted, promoted, allowed, and covered up Pickens' abuse of disabled children, and his actions ensured Pickens continued to abuse disabled children for years.

22.

Defendant Stephanie Sosebee (hereinafter referred to as "Sosebee") is a resident of Dawson County, Georgia and resides at 251 Mayapple Glenn, Dawsonville, Georgia  30534.  Sosebee was a special education teacher of students with moderate, severe, or profound mental impairment at Holcomb Bridge from at least 2002-2004 and from at least 2004-2007 at Hopewell, and she was the co-lead teacher or the lead teacher on G Hall at Hopewell during the 2005-2006 or the 2006-2007 school year or both.  Sosebee witnessed Pickens' abuse of disabled children with moderate, severe, or

profound mental impairment, and Sosebee never reported Pickens' ongoing abuse to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the parents of the abused disabled children. Instead, Sosebee allowed, endorsed, accepted, and covered up Pickens' abuse of disabled children.

23.

Defendant Stacy White (hereinafter referred to as "White") is a resident of Fulton County, Georgia and resides at 430 Hunters Crossing Drive, Atlanta, Georgia 30328. White was a special education teacher at Hopewell from August 2004 to May 2007, and she was also the lead special education teacher for the G Hall at Hopewell during the 2006-2007 school year. From 2004 to 2007, White witnessed and was informed Pickens repeatedly abused disabled children, yet White never once reported Pickens' abuse of disabled children to the GaPSC, DFACS, the FCSD police, any other criminal investigative agency, or the parents of the children abused. White's actions allowed, aided, facilitated, promoted, and covered up Pickens' continued abuse of disabled children.

24.

Defendant Templyn Averett, also known or formerly known as "Templyn Britt," (hereinafter referred to as "Averett") is a resident of

14

Greenville, County, South Carolina and resides at 100 Tybee Drive,

Simpsonville, South Carolina  29681.  Averett was the lead special

education teacher on the G Hall at Hopewell during the 2004-2005 school

year and had been informed more than once and had herself witnessed

Pickens' abuse of disabled children with moderate, severe, or profound

mental impairment, but Averett did not report Pickens' abuse of these

disabled children to the GaPSC, DFACS, the parents of the disabled

children, the FCSD police, or any other criminal investigative agency, and

Averett knew the abuse was continuing and she herself allowed it to

continue and covered it up.

<div align="center">25.</div>

Defendant Kenneth McGee, also called or known as "Ken McGee,"

(hereinafter referred to as "McGee") is a resident of DeKalb County,

Georgia and resides at 864 Ashton Oak Circle, Stone Mountain, Georgia

30083.  McGee was the FCSD social worker at Hopewell from August 2004

to at least May 2007, and during that time, McGee was aware of the reports

of Pickens' abuse of disabled children, and McGee never reported the abuse

to his social work supervisor, the GaPSC, DFACS, parents of the disabled

children abused, the FCSD police, and any other criminal investigative

<div align="center">15</div>

agency.  McGee allowed Pickens' abuse of disabled children to continue for
years, and he covered it up.

26.

Defendant Cindy Kanner (hereinafter referred to as "Kanner") was
since at least May 2007 and currently is a FCSD Employee Relations
Specialist, taking directives from Wade.  Acting intentionally and in bad
faith and in concert with Wade and Wilson and for the purposes of
improperly concealing the abuse of Garrett and numerous other disabled
children with moderate, severe, or profound mental impairment, Kanner did
not report in May 2007 or thereafter Pickens' abuse to the FCSD police or
any other criminal investigative agency, even though her position required
she do so.  Kanner also acted with others to alter government documents and
destroy evidence.

27.

Defendant Michael Vanairsdale, also called "Mike Vanairsdale,"
(hereinafter referred to as "Vanairsdale") is a resident of Glynn County,
Georgia and resides at 200 Salt Air Drive, Apartment 144, Saint Simons
Island, Georgia  31522.  Alternatively, Vanairsdale is a resident of Fayette
County, Georgia and resides at 107 Centennial Drive, Peachtree City,
Georgia  30269.  Vanairsdale was a FCSD assistant superintendent in 2002,

the superintendent or acting or interim superintendent in 2004, and a deputy superintendent in 2006.  Vanairsdale, Lynch, Denmark, Reece, Boyd, and others intentionally and maliciously determined that FCSD would not report Pickens' abuse of Jake Marshall and other disabled students at Hopewell to DFACS, the GaPSC, the abused disabled children's parents (other than Jake's mother and then only in part and not truthfully), the FCSD police, or any other criminal investigative agency.  Vanairsdale, acting in concert with others, including but not limited to Boyd, Lynch, Reece, and Denmark, also intentionally and maliciously decided and required that Pickens not be cited in writing in her *permanent* FCSD personnel file for her abuse of disabled children at Hopewell during 2004 but that she would only be written up in part in a letter that was to be placed only in her Hopewell file, not her permanent personnel file.  Vanairsdale also acting in concert decided that Pickens would not be fired or placed on a formal improvement plan but would be allowed to continue her abuse of disabled children for years thereafter.

28.

Defendant J. Randall Reece, also called or known as "Randy Reece," (hereinafter referred to as "Reece") is a resident of Cobb County, Georgia and resides at 470 Stillwaters Drive SW, Marietta, Georgia  30064.  Reece

17

was the FCSD chief of the human resources office in 2002, 2003, and 2004 and was also the FCSD Compliance Coordinator in 2004 and again in 2005. Reece was informed during the 2002-2003 school year that Pickens was abusing disabled children, and Reece, in concert with Vanairsdale, Pettes, Shelley, Etris, Faulkner, Shaffer, Young, and it is believed others intentionally and maliciously decided to continue to allow Pickens to teach and to not have her abuse documented or reported to the GaPSC, parents of the children abused, DFACS, the FCSD police, or any other criminal investigative agency.  Reece's improper actions and inactions ensured that Pickens would continue abusing disabled children, including Garrett, for years.

<div align="center">29.</div>

Defendant Lance Young (hereinafter referred to as "Young") was the Executive Director of Human Resources Operations in 2002 and at least until 2010.  Young was informed at some time from 2002 to 2004 and thereafter that Pickens had abused one or more disabled children, and Young did not report the abuse to the GaPSC, the children's parents, DFACS, the FCSD police, or any other criminal investigative agency, and he also took actions to ensure Pickens continued teaching and abusing disabled children

<div align="center">18</div>

and that parents of the abused disabled children were never informed of the abuse.

30.

Defendant Sharon Butler (hereinafter referred to as "Butler") is and has been a FCSD behavior specialist from before the 2002-2003 school year to May 2007 and some time thereafter, and she was informed by Pettes, Faulkner, Etris, and perhaps others during the 2002-2003 school year and until 2007 that Pickens was abusing disabled children with disabilities, and Butler did not report the abuse to the GaPSC, DFACS, the children's parents, the FCSD police, or any other criminal investigative agency, and she did not prevent the abuse.  Instead, acting in concert with other named Defendants, Butler allowed Pickens to continue abusing disabled children.

31.

Defendant Sarah Ware (hereinafter referred to as "Ware") was a FCSD Special Education Coordinator of elementary schools and a special education supervisor over Woodland Elementary School ("Woodland") and/or an IST over Woodland during the years from 2003 to 2006.  Ware was informed that Pickens abused one or more disabled children attending school during the summer of 2001, 2003, 2004, 2005, 2006 or two or more of those summers, and Ware did not report the abuse to the GaPSC, DFACS,

the parents of the disabled children abused, the FCSD police, or any other
criminal investigative agency.  Instead, Ware took concerted actions with
other Defendants to allow Pickens to continue abusing disabled children for
years and to cover up that abuse.

32.

Defendant Sharon Etris (hereinafter referred to as "Etris") was the IST
at Holcomb Bridge when Pickens taught there during the 2002-2003 and
2003-2004 school years, and Etris knew about and was informed of Pickens'
abuse of disabled children with moderate, severe, or profound mental
impairment, yet Etris did not report Pickens' abuse of the disabled children
to the abused disabled children's parents, GaPSC, DFACS, the FCSD police,
or any other criminal investigative agency.  Instead, Etris took concerted
actions with other Defendants to allow Pickens to continue abusing disabled
children and to cover it up.

33.

Defendant Sarah Biegelson (hereinafter referred to as "Biegelson") is
a resident of Cherokee County, Georgia and resides at 703 Conley Drive,
Canton, Georgia  30115.  Biegelson was an assistant principal at Hopewell
during the 2006-2007 school year to some time thereafter, and at all times
was a GaPSC licensed education.  Biegelson was in charge of special

education and she knew about the abuse of disabled children by Pickens during the 2006-2007 school year, and she did not inform the GaPSC, DFACS, the FCSD police, any other criminal investigative body, or the parents of the abused disabled children, and after the 2006-2007 school year, Biegelson instructed Hopewell employees not to reveal the abuse to anyone, including parents, which caused Garrett and other disabled children further harm.

## **JURISDICTION AND VENUE**

### 34.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

### 35.

This Court has venue because one or more of the Defendants reside in Fulton County, Georgia and a substantial part, if not all, of the events giving rise to the claims set forth herein occurred in Fulton County, Georgia.

## **FACTS –ABUSE BEGINS AT HOLCOMB BRIDGE AND ESY**

### 36.

From January 2002 to May 2002, Defendant Pickens' was a student teacher, and her performance as a student teacher was reported in writing to be *unsatisfactory* in the following areas:  planning and preparing work

efficiently, utilizing a variety of teaching methods and skills, exercising

appropriate pupil control and classroom management techniques, and

fulfilling responsibility in a dependable manner.

37.

When Pickens was a student teacher, Pickens' college coordinator

reported in writing that she would not employ Pickens as a teacher for her

own child.

38.

FCSD was provided the written information referenced in paragraphs

36 and 37 above prior to FCSD hiring Pickens to teach disabled children

with moderate, severe, or profound mental impairment in FCSD.

39.

Having been informed in writing of the facts asserted in paragraphs 36

and 37 above, FCSD hired Pickens as a special education teacher on or

about August 5, 2002.

40.

When FCSD hired Pickens to teach children with mental impairment

at Holcomb Bridge in FCSD during the 2002-2003 school year, Pickens was

not certified to teach those disabled children without having a properly

certified teacher in the class, and Defendants FCSD, Shelley, and Pettes were aware of this in 2002.

41.

FCSD hired Pickens to teach at Holcomb Bridge during the 2002-2003 and 2003-2004 school years, and FCSD was aware that during the very first year Pickens taught in FCSD, Pickens was abusing one or more disabled children with mental impairment in her class.

42.

FCSD was aware through one or more of its employees and/or administrators that Pickens was abusing disabled children during Pickens' second year as a teacher at Holcomb Bridge.

43.

While a teacher at Holcomb Bridge, Pickens was very rough with one or more disabled children at Holcomb Bridge, and she yanked one or more of the children around, she screamed and yelled at one or more of them, she pulled at least one child's ear, she pulled at least one child's hair, and she placed disabled children alone in the bathroom in the dark.

44.

FCSD, Pettes, Etris, Faulkner, Shaffer, Young, Reece, Shelley, Butler, Pickens, Sosebee, and other FCSD employees witnessed and/or were

informed of Pickens' abuse of disabled students while Pickens was at

Holcomb Bridge, including some or all of the abuse reported as set forth in

paragraph 43 above.

45.

A child in Pickens' class while Pickens taught at Holcomb Bridge

reported to his mother that Pickens would place children in the bathroom

with the lights out and the door shut, and the child's mother, who was a

FCSD bus driver, informed FCSD staff of the fact Pickens was placing

disabled children in the bathroom with the lights out and the door shut, and

this mother's child was removed from Pickens' classroom, but other

disabled children remained with Pickens.

46.

FCSD paid Pickens to teach extended school year services

(hereinafter referred to as "ESY") to disabled children during either the

summer of 2001, 2003, 2004 or any combination thereof.  During one or all

of those summers during ESY, it was reported to one or more FCSD

employees, including but not limited to Ware, Pettes, and Shelley, that

Pickens had been physically rough with one or more disabled children

during the ESY program.

47.

On November 7, 2011, Pettes testified under oath at an IDEA due process hearing requested by Alexander Williams' parents (hereinafter referred to as "the IDEA due process hearing") that it was reported to her by the principal (who was Shaffer) that a referral had been filed with DFACS regarding Pickens' abuse of disabled children while Pickens was at Holcomb Bridge. However, Pettes informed Mr. Umbarger, an investigator, in an interview in 2007, that FCSD did not conduct any official investigation or even involve a social worker into the allegations of abuse of the disabled children by Pickens at Holcomb Bridge.

48.

FCSD, Pettes, Etris, Faulkner, Shaffer, Young, Reece, Shelley, Butler, Pickens, Sosebee and other FCSD personnel never reported Pickens' abuse of disabled children while Pickens was at Holcomb Bridge or during ESY at Woodland Elementary School to any social worker, DFACS, FCSD police, any other criminal investigative agency, or the parents of the disabled children being abused. One or more did, however, report Pickens' abuse to FCSD administration, including an area superintendent, superintendent, director of human resources, or any combination thereof, and were told to maintain Pickens as a FCSD teacher of disabled children and to not report

Pickens to any authority or note in her teacher review her abuse of disabled children.

49.

Shaffer told Pettes that Pickens would continue to be a teacher, and this was because Shaffer was advised to continue Pickens' employment by the FCSD administration.

50.

Shaffer has since lied about his knowledge of Pickens' abuse, stating he was never once told of any issues of Pickens being too rough with disabled children when in fact he was informed of Pickens' abuse of disabled children.

51.

FSCD administration, including Young and Reece, advised Shaffer, Pettes, and Shelley (who all were FCSD administrators themselves) that Pickens would continue teaching in the FCSD, would not be written up or put on a professional development plan, would not have her abuse documented in her teacher review, and would not be reprimanded in writing.

52.

FCSD, Pettes, Etris, Faulkner, Shaffer, Young, Reece, Shelley, and Butler did not reprimand Pickens in writing for her abuse of disabled

children at Holcomb Bridge, and they never reported Pickens' abuse of

disabled children to the GaPSC, DFACS, the abused disabled children's

parents, the FCSD police, or any other criminal investigative agency.

Instead, they allowed, sanctioned, permitted, ratified endorsed, and covered

up Pickens' abuse of disabled children with mental impairment.

53.

During a due process hearing conducted pursuant to the Individuals

with Disabilities Education Improvement Act, Alexander Williams and his

parents subpoenaed all documents from FCSD regarding any abuse or

alleged abuse by Pickens, and the administrative law judge (hereinafter

referred to as "ALJ") ordered all such documents be produced, yet FCSD did

not produce even one document regarding any abuse or alleged abuse by

Pickens of any children at Holcomb Bridge or during ESY, and this is so

even though documents involving Pickens' abuse of disabled children at

Holcomb Bridge and during ESY existed and still exist.

54.

FCSD has taken intentional actions to destroy, delete, alter, and not

produce documents involving Pickens' abuse of disabled children while

Pickens was employed by FCSD, including when she taught at Holcomb

Bridge, Woodland Elementary School, and Hopewell and while she taught ESY.

55.

FCSD had and still has, unless it deleted or destroyed the documents, documents, including emails, directly involving the abuse by Pickens of one or more students while Pickens taught at Holcomb Bridge, Woodland Elementary School, and Hopewell and during ESY.

56.

In 2003 or 2004, Pettes recommended to Shaffer, the Holcomb Bridge principal, that Pickens' FCSD contract to teach not be renewed, but Shaffer responded to Pettes (in meaning and not perhaps these exact words) that Pettes' job was not personnel, that her job was to provide support, and FCSD's expectation was that she would train Pickens.

57.

In 2003 or 2004, Shaffer told Pettes that stated in paragraph 56 above because FCSD administration, including the FCSD human relations department and at least one assistant superintendent, made that decision.

58.

Pickens never responded to any training or help when she was at Holcomb Bridge but instead continued to abuse disabled children, and

FCSD, Pettes, Shaffer, Etris, Faulkner, Shelley, Sosebee, Reece, Young, Ware, and Butler were aware of this at the time.

59.

When Pickens taught at Holcomb Bridge, Pettes had concerns about Pickens and her abuse of disabled children, and at some point in time during either the 2002-2003 or the 2003-2004 school year, Pettes recommended to Shelley, her FCSD special education supervisor, that Pickens' FCSD contract to teach not be renewed, but in response to this suggestion, Shelley responded to Pettes in meaning and not perhaps these exact words that Pettes' job was not personnel, that her job was to provide support, and the expectation from FCSD was that she would train Pickens.

60.

Shelley discussed Pickens' abuse of disabled children, at the least, with the FCSD human resources department.

61.

During the time Pickens taught at Holcomb Bridge, Pettes was informed during that time that Pickens had harmed a disabled student, and Pettes has testified under oath to this fact.

62.

Shaffer, Shelley, Faulkner, Etris, Butler, and Pettes had all been informed during the time Pickens was employed by FCSD at Holcomb Bridge that Pickens had harmed a disabled child.

63.

Pettes talked to Shaffer about Pickens harming a disabled child at Holcomb Bridge, and Pettes has testified to this under oath.

64.

Shaffer told Pettes he had reported Pickens' abuse to a FCSD social worker, and Shaffer lied when he told Pettes this.  Alternatively, Pettes lied under oath when she testified that Shaffer told her he had reported Pickens' abuse to a FCSD social worker.

65.

Shaffer told Pettes he had reported Pickens' abuse to DFACS, and Shaffer lied when he told Pettes this.  Alternatively, Pettes lied under oath when she testified that Shaffer told her he had reported Pickens' abuse to a FCSD social worker.

66.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and Faulkner and discuss with both Pickens and Faulkner Pickens' abuse of one or more disabled children Pickens taught.

67.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and Butler and discuss with both of them Pickens' abuse of the disabled children Pickens taught.

68.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and Shaffer and discuss with both of them Pickens' abuse of the disabled children Pickens taught.

69.

When Pickens taught at Holcomb Bridge, Pettes would sit down with Pickens and any combination of Faulkner, Butler, Etris, Pickens, and Shaffer and discuss with them Pickens' abuse of the disabled children Pickens taught.

70.

When Pickens taught at Holcomb Bridge, Pickens had a very quick temper with the disabled children in her class, and Pickens would become angry easily at the disabled children and would abuse the disabled children.

71.

When Pickens taught at Holcomb Bridge, Pickens would excessively and unduly severely corporally punish the disabled children in her class due to her temper.

72.

During the time Pickens was at Holcomb Bridge, Pettes, Faulkner, Etris, Shelley, Butler, Pickens, and Shaffer knew Pickens had a short, quick temper and would get angry with the disabled children she taught and abuse them and excessively and unduly severely physically punish them.

73.

When Pickens was at Holcomb Bridge, Pickens would not implement necessary teaching techniques she was told how to do, and Pettes, Faulkner, Butler, Etris, Shelley, and Shaffer knew this.

74.

When Pickens was at Holcomb Bridge, FCSD, Pettes, Faulkner, Butler, Etris, Shelley, Young, Reece, and Shaffer knew Pickens was not

certified to teach the disabled children she was teaching during the 2002-2003 or 2003-2004 school year or both.

## FACTS – ABUSE OF A DISABLED CHILD DURING SUMMER

### 75.

During the summer of 2001, 2002, 2003, 2004, 2005, or 2006 (hereinafter referred to as "summer"), Pickens taught ESY, and Pickens was very physically rough with a disabled child and harmed the child.

### 76.

Because of Pickens' abuse of the disabled child during the summer, FCSD insisted Pickens take an anger management course, which Pickens did not take.

### 77.

During the summer, Pickens grabbed a disabled child's penis so hard or otherwise did something to the child's penis to cause the child to suffer damage and harm to the disabled elementary school child's penis and to cause him to suffer a penile embolism, requiring medical care.

### 78.

Pickens admitted she grabbed a child's penis, alleging the child was falling in the bathroom so she grabbed the child by his penis to stop him from falling.

79.

Due to Pickens' physical harm to a disabled child during the summer, FCSD entered into a settlement agreement with the parent or parents of the disabled child who suffered the penile injury, and as part of the settlement agreement, the parent was not, by contract, to share the facts of what happened to her child with others.

80.

Regarding the settlement referenced in paragraph 79 above, FCSD paid the child's parent or parents $75,000 as part of the settlement agreement, which required that the incident and abuse by Pickens could not be disclosed.

81.

After this abuse during the summer and settlement agreement as set forth above, FCSD continued to allow Pickens to teach disabled children with moderate, severe, and profound mental impairment.

82.

After Pickens physically harmed a disabled child during the summer, FCSD, Reece, Vanairsdale, Young, Ware, Shelley, Pettes, Butler, and Faulkner, at the least, did not report Pickens' abuse of a disabled child to DFACS, the GaPSC, the parents of the child, the FCSD police, or any other

34

criminal investigative agency, nor did they take any action to prevent

ongoing abuse of disabled children by Pickens, but instead they continued to

take actions to allow the abuse to continue and to cover it up.

## FACTS – ABUSE OF DISABLED CHILDREN AT HOPEWELL

83.

After FCSD, Shelley, Pettes, Shaffer, Reece, and Young, as well as

others, had become aware Pickens was abusing disabled children, one or

more of them took actions to allow Pickens to continue to abuse disabled

children and in fact to do so with less visibility from other teachers, students,

and parents by transferring Pickens from Holcomb Bridge to Hopewell for

the 2004-2005 school year to teach on the G Hall, a segregated hall for

children with moderate, severe, or profound mental impairment.

84.

The disabled children FCSD placed on G Hall in Pickens' class could

not go home and tell their parents the abuse they suffered at Hopewell due to

their disabilities, which included moderate, severe, or profound mental

impairment.

85.

During the 2004-2005, 2005-2006, and 2006-2007 school years, no

regular education student received his or her educational program on the G

Hall, and no disabled child who did not have a moderate, severe, or profound mental impairment was educated on G Hall.

86.

During the 2004-2005, 2005-2006, and 2006-2007 school years, Pickens' classroom was the last or next to last classroom down G Hall from the interior of the building.

87.

Pickens began abusing disabled students with moderate, severe, or profound mental impairment at Hopewell during the first month she started at Hopewell in August 2004.

88.

Before Pickens began teaching at Hopewell or shortly thereafter and no later than August 31, 2004, Pettes informed Boyd, who was the principal of Hopewell, that Pettes had concerns with Pickens and her rough treatment of disabled children while Pickens was at Holcomb Bridge and because of this Pettes would be bringing FCSD employees over to train and work with Pickens, yet Boyd denies Pettes informed her of this, but Pettes has testified under oath she did this.

89.

In talking to others in reference to the disabled students placed on G Hall, Boyd stated to at least three individuals that they should have "cut the cord" on those children a long time ago.

90.

Boyd, who did not like the disabled children with moderate, severe, to profound mental impairment placed on the G Hall at Hopewell, was the principal of Hopewell and as such it was her duty to oversee all operations at Hopewell, supervise teachers and staff, report child abuse of students by staff, oversee staffing and hiring of staff at her school, and ensure the safety of the disabled children attending Hopewell.

91.

Merritt, as the IST, was the supervisor at Hopewell who oversaw and supervised special education and special education staff at the middle school, and her job duties included reporting child abuse of disabled students, overseeing the day-to-day operations of the special education department at Hopewell, overseeing hiring of special education staff, and among other duties, directly training and supervising special education staff, including teachers and paraprofessionals (hereinafter referred to as "paras").

92.

Both Boyd and Merritt had authority to recommend and have their recommendations followed regarding the hiring and firing of staff.

93.

Yasaland King (hereinafter referred to as "King") was hired in August or September 2004 to be a para at Hopewell on the G Hall, and King testified Merritt hired her.

94.

When King was hired by Merritt, Merritt told King she wanted King to be Merritt's eyes and ears on G hall, and when King began working at Hopewell, Merritt had already been informed that Pickens was abusing one or more disabled students on G Hall.

95.

King saw Pickens abuse disabled children at Hopewell, if not the first day King began working at Hopewell, within a week or two, and King reported the abuse she saw to Merritt at least five times.

96.

King reported Pickens abuse of disabled children on G Hall to Boyd at least two times, and after each report by King of the abuse, King continued to witness Pickens abusing disabled children on the G Hall.

97.

In November 2004, Judy Reddick (hereinafter referred to as "Reddick"), a then FCSD nurse, reported to Boyd that Pickens was abusing disabled children, but Boyd refused to accept Reddick's written report of this, and Boyd did not inform FCSD social services department but instead discussed Pickens' reported abuse with her FCSD supervisors.

98.

After Boyd refused Reddick's report of abuse by Pickens, Reddick then told Meadows, the FCSD head of nursing services what had happened, and Meadows herself directly reported the abuse to FCSD's social work services.

99.

After Boyd refused Reddick's report of abuse by Pickens, Meadows told Reddick to give a written statement or letter of the abuse to some administration at Hopewell, and when Boyd learned that Reddick had reported Pickens abuse to Reddick's supervisor, Boyd was not pleased that Reddick had done so, and Boyd told Reddick this.

100.

After talking to Meadows, Reddick addressed her letter to and gave it to Merritt on November 16, 2004, stating, inter alia, that Reddick had

"personally witnessed" "on many occasions" Pickens hit a disabled student "usually in the head." Reddick, stated in her letter that "the hitting at times seems quite hard" and further reported "[t]he student frequently cowers and covers his head when he feels he is about to be disciplined."

101.

Reddick reported as well in her November 2004 letter to Merritt, which Merritt, Thompson, and Boyd were all provided with in November 2004, that Pickens sprayed Lysol on a disabled student and left the disabled child in the hall by herself and that this had been reported to her (Reddick) and that she (Reddick) had witnessed this herself.

102.

Defendant Schuette, a then FCSD social worker, was told by Defendant Beasley, the FCSD head of social work services, to go to Hopewell, investigate the alleged abuse, and complete a report within 24 hours regarding the investigation.

103.

Vanairsdale, Reece, Young, Denmark, and Lynch communicated about the matter, decided not to fire Pickens, not to bring a dismissal action against her, not to write her up, and to allow her to continue teaching, and

these Defendants, in some combination, and at least Boyd, Denmark, and Lynch, wanted Schuette at Hopewell at 2 p.m. on November 17, 2004.

104.

FCSD had never had a social worker investigate Pickens' abuse of disabled children prior to November 2004.  Alternatively, FCSD had a FCSD social worker investigate Pickens' abuse of disabled children and has destroyed all documents related thereto or otherwise never provided any documentation of this to and abused disabled children's parents even though such has been subpoenaed and requested pursuant to the Georgia Open Records Act.

105.

Defendant Thompson and Boyd, acting in concert with FCSD and other FCSD administrators, did not cooperate with the investigation regarding abuse of disabled children by Pickens, and they did not inform any of the parents of the abused disabled children of the abuse.

106.

Thompson and Boyd did not complete paper work, did not collect statements from witnesses, did not provide necessary information for use by Schuette, and did not initially collect a statement from Pickens about the allegations of abuse by the FCSD nurse because FCSD, Boyd, Thompson,

Lynch, Denmark, Reece, Young, and Vanairsdale had already decided before Schuette came to Hopewell the outcome of the investigation and the report by Reddick, which was to not report the abuse to the GaPSC, DFACS, the FCSD police, or any other criminal investigative agency and to allow Pickens to continue teaching disabled students without reprimand on Pickens' teacher evaluation and without a formal improvement plan.

107.

Schuette did not collect statements about Pickens' alleged abuse but only took limited notes from some of the witnesses, and Schuette she did not thoroughly investigate Pickens' abuse of disabled students by taking statements or by talking with one or more visiting regular education high school students who had gone to Hopewell and saw some of Pickens' abuse.

108.

When Boyd first heard about the FCSD nurse's allegations of abuse of disabled students by Pickens, Boyd contacted her supervisors, Defendant Lynch, who was at the time the FCSD superintendent of secondary personnel, and Defendant Denmark, who was at the time the FCSD area superintendent with supervisory responsibilities over Hopewell.

109.

Denmark and Lynch informed Boyd she was not to give Pickens a "Needs Improvement" on Pickens' upcoming teacher evaluation, and Boyd gave Pickens only a positive evaluation.

110.

Denmark and Lynch informed Boyd to write a letter to Pickens, which was placed allegedly in Pickens' file at Hopewell, but which was not placed in Pickens' permanent educator file with FCSD at the main office.

111.

Denmark and Lynch informed Boyd Pickens was not to be fired.

112.

Two witnesses (Reddick and Jennifer Lina) reported in November 2004 to Schuette that they had witnessed more than once Pickens hit a disabled student in the head hard, and a para reported to Schuette that she had seen Pickens slapping the disabled child's hands and taking him for a walk alone and that this would upset the child.

113.

A FCSD nurse (Reddick), therapist (Lina), and para all reported to Schuette hearing Pickens cursing in front of the disabled children, calling them curse names, or both.

114.

A FCSD physical therapist (Lina) reported to Schuette that the therapist had heard Pickens calling the disabled children "little sh_ts" and using the word "f_ck" in their presence.[2]

115.

The therapist reported to Schuette that Pickens restrained a disabled child's arm to a wheelchair and said something like this:  "I know we are not supposed to restrain kids, but we won't call this a restraint."

116.

When Reddick was interviewed by Schuette, Reddick told Schuette that Pickens called the disabled children "little sh_ts" and "little f_ckers" and that Pickens restrained one or more disabled children to a chair and placed the child or children alone in a room.

117.

Schuette discarded or otherwise did not produce her notes of her interview with Reddick, and she did not include in her abuse investigation report that Pickens was placing one or more disabled children restrained to chairs in a room by themselves.

---

[2] The missing letter in "sh_ts" is an "i," and the missing letter in the words "f_ck" and "f_ckers" is a "u." That is so throughout this Complaint.

118.

A FCSD physical therapist told Schuette she had seen Pickens hit Jake Marshall (a disabled child) harder in the head than a pat on more than once occasion, has seen Pickens abandon Repheka Persadi (a disabled child) in the hall, and restrain a child's arm to a chair while Pickens said she knew restraint was not allowed but they just wouldn't call it restraint.

119.

Schuette prepared an Investigation Report of the allegations of abuse on November 18, 2004, but Schuette later altered that report and either destroyed or has not maintained the original report prepared on November 18, 2014.

120.

Although FCSD received a copy of the original Investigation Report Schuette prepared on November 18, 2014, FCSD has never provided that report, even though it was subpoenaed and even though it was responsive to requests for Jake Marshall's and other disabled children's education records and it was responsive to Georgia Open Records Act requests.

121.

Schuette had a folder on Jake Marshall and the November 2004 investigation of abuse by Pickens, but FCSD did not produce that folder or

the documents in it (except for a few) pursuant to subpoena at an IDEA due

process hearing involving Alexander Williams even though the folder and its

contents were responsive to a subpoena served upon FCSD and the ALJ

ordered FCSD to produce responsive documents, which included the folder

Schuette had.

<div align="center">122.</div>

Schuette testified under oath in a deposition in October 2012 that her

investigation began on November 18, 2004 and ended on November 19,

2004.

<div align="center">123.</div>

Schuette sent Thompson an email about the investigation of alleged

abuse by Pickens.

<div align="center">124.</div>

Even though abuse was alleged to have occurred to Jake Marshall, it

was also alleged to have occurred to Repheka Persadi (and all the children),

but no one informed Repheka's mother or any other parents other than

Jake's mother of any allegation of abuse, and Thompson and Boyd did not

inform Jake's mother.

125.

Thompson and Boyd did not timely obtain a statement from Pickens at first, even though Pickens orally admitted hitting Jake in the head, for Thompson and Boyd, both supervisors and FCSD administrators, were waiting for word from Lynch, Denmark, Vanairsdale, and others as to how to proceed regarding the allegations.

126.

In 2004, FCSD, Lynch, Denmark, Young, Reece, and Vanairsdale, at the least, made a decision that Pickens was not to be fired or given a "Needs Improvement" on her upcoming evaluation for hitting and slapping Jake Marshall, a disabled child in the head and hands, and for calling students fowl names, and these Defendants as well as Schuette, Beasley, Thompson, Pettes, Shelley, Merritt, McGee, and Boyd, at the least, all agreed with allowing, adopting, ratifying, and following that recommendation.

127.

All Defendants named in paragraph 126 above intentionally, maliciously, and willfully decided to allow a known child abuser, Pickens, to continue being with disabled students (including Garrett) who because of their disabilities, could not talk at all or otherwise could not tell someone they were being abused by Pickens.

47

128.

All the Defendants named in paragraph 126 decided and acted in concert maliciously and with intent to harm disabled children, not to inform the GaPSC, the FCSD police, any other criminal investigative body, or DFACS of Pickens' abuse in November 2004, and not one of them reported any of these agencies of the child abuse by Pickens in 2004 or anytime thereafter.

129.

Beasley, acting in concert with FCSD and all or some of those Defendants named in paragraph 126 above, told Schuette to not report Pickens' abusive actions investigated in November 2004 by Schuette as abuse and to not report Pickens' actions to DFACS.

130.

Schuette was aware that Pickens was abusing disabled children in November 2004 and had concerns about Jake's safety, and Schuette testified under oath in a deposition in 2012 that FCSD administrative staff above her were the ones to make decisions about Jake's placement and Jake's safety in that environment.

131.

From 2002 until at least May 2007, it was FCSD's policy, practice, and procedure to not report abuse by FCSD teachers of disabled children with moderate, severe, or profound mental impairment to DFACS, not to fire teachers who abused these students for the teacher's abuse, to cover up the abuse, and to allow it to continue, and this is exactly what the Defendants named in paragraph 126 above did, and this ensured that when Garrett was placed by FCSD at Hopewell in August 2004, he was going to be severely abused, and he was.

132.

Schuette prepared her investigative report involving Pickens' reported abuse of disabled children on November 18, 2004 and provided it to FCSD on that day, yet on November 22, 2004, she altered the report dated November 18, 2004, but did not note it as an amendment, nor did she prepare a new report with a correct date of November 22, 2004.

133.

Schuette maintained a copy of the altered investigative report she prepared in November 2004 regarding Pickens but did not retain a copy of her original investigative report, even though she was served with a subpoena by Alexander Williams and his parents during an IDEA due

process hearing, and Schuette's original report was responsive to the subpoena served upon her.

134.

Schuette was informed during her investigation of Pickens in November 2004 that Merritt was aware of earlier abuse by Pickens, but Schuette never obtained a statement from Merritt or interviewed Merritt, and Merritt never provided a statement to Schuette.

135.

When Schuette was served with a subpoena to bring to Alexander Williams' IDEA due process hearing all documents involving in any way Pickens' abuse or alleged abuse of one or more disabled students, Schuette cut and pasted a few parts of a few responsive emails and then she deleted all of the responsive emails from her computer.

136.

When FCSD, through its counsel, was asked at the hearing if FCSD had produced all documents involving in any way any abuse by Pickens or alleged abuse, FCSD, through its counsel, stated it had and stated further that no FCSD employees subpoenaed to the IDEA due process hearing had any documents not already provided.  ***This was not true***, but Alexander Williams, his parents, and his counsel did not know this and in reliance on

this incorrect representation from FCSD's counsel, Schuette was released from the subpoena served upon her.

137.

When FCSD was subpoenaed during the IDEA due process hearing for Alexander Williams for all documents involving abuse or alleged abuse by Pickens, FCSD never even asked Schuette to provide to FCSD even one document related to the reported abuse FCSD knew Schuette had investigated in 2004 and even though FCSD required Schuette to keep a file on each investigation.

138.

Due to her training from FCSD, Schuette does not find a teacher hitting a disabled child upside the head hard enough to move that child's head to be child abuse or that calling a child a "little sh_t" is verbal abuse.

139.

Even though Schuette was informed by two witnesses (a FCSD nurse and a FCSD physical therapist) that they had seen on more than one occasion Pickens hit Jake on the head hard enough to hurt and by a para that she had seen Pickens slap Jake's hands, Schuette prepared a final investigative report (after her first report) claiming this abuse was merely "poor choices and discipline strategies."

140.

Schuette omitted from her final altered investigative report she prepared in November 2004 some important facts reported to her, such as Pickens slapping Jake's hands and putting him in a room alone and restrained to a chair as well as other such relevant information.

141.

Schuette altered her report after the fact, failed to maintain relevant documents, destroyed responsive emails after being served a subpoena, determined Pickens would not be reported to DFACS, and took all other actions described in this Complaint while acting in concert with the Defendants named in paragraph 126 above.

142.

During her deposition taken in October 2012, in reference to Schuette's involvement with Pickens' abuse of disabled children, Schuette was asked: "Do you believe you have done anything wrong in this matter?" Schuette replied, "I don't know how to answer that." When asked again, Schuette responded, "I can't answer that.  I don't know how to answer that." Then, when Schuette was asked, "Why can't you answer it?," Schuette replied, "I don't know how to answer it."

143.

After November 22, 2004, Pickens continued to abuse Garrett and the
other students in Pickens' class in front of many FCSD employees, and
many FCSD administrators were informed of Pickens' ongoing abuse of
disabled students with moderate, severe, or profound mental impairment.

144.

Many FCSD employees reported Pickens' ongoing abuse from 2004
to 2007 to Boyd, Thompson, Merritt, Wadel, Pettes, FCSD, Butler, Ware,
Biegelson, and others.

145.

Pettes testified during the IDEA due process hearing for Alexander
Williams that FCSD was aware that Pickens was hurting children for many
years, and Pettes herself was aware that Pickens was hurting disabled
children for many years as well.

146.

Just by November 2004, Pickens abuse of disabled students who
could not themselves report the abuse was known by, at the least, ***27
different FCSD educators***, including two FCSD principals at two different
middle schools (Shaffer and Boyd); one assistant principal (Thompson);
some FCSD teachers and assistants at Holcomb Bridge (Etris, Sosebee, a bus

driver, and others); a FCSD middle school special education coordinator (Pettes); a FCSD behavior specialist (Butler); two FCSD special education directors (Shelley and Wadel); two FCSD social workers (Schuette and McGee); a FCSD special needs nurse (Reddick); a FCSD physical therapist (Lina); the FCSD coordinator of student health services (Meadows); the FCSD head of social worker services (Beasley); three FCSD IST's at two different middle schools and at one elementary school (Faulkner, Ware, and Merritt); at least two FCSD classroom assistants (Massey and King); the FCSD director of secondary personnel (Lynch); a FCSD area superintendent (Denmark); one superintendent (Vanairsdale); and two FCSD directors of human resources (Reece and Young); and at least two teachers at Hopewell (Averett and Sosebee), and the FCSD and the named Defendants herein allowed this horrific abuse of disabled children to continue for more than two more years by acting in concert to allow, cover up, sanction, and not report the abuse.

147.

Each of the individuals named in paragraph 146 had either seen directly Pickens' abuse a disabled child or children or had received one or more reports that Pickens was abusing, as defined in footnote 1 of this Complaint, disabled children, and it is because of the actions of the

Defendants named in this Complaint that Garrett was so severely abused for three school years.

148.

From 2002 to 2007 or during some time between 2002 and 2007, Pettes and all other named Defendants had knowledge that Pickens was doing one, some, or all of the following to disabled children who could not themselves report the abuse:  screaming at them, pulling ears, pulling hair, placing disabled children in a bathroom restrained and alone and at times with the lights out, being rough with them, yanking them, calling them "little f_ckers," calling them "little sh_ts," shoving them, strapping them in or otherwise restraining them in a chair and leaving them in a room alone (sometimes in the dark), kicking them, jacking them up, shoving them into lockers, shoving them into walls, pushing them down on hard surfaces, throwing hard objects at them, putting and rubbing her buttocks in their faces, putting and rubbing her breasts in their faces, letting them touch her buttocks while saying you know you like that to the student, depriving them of food, passing gas directly in their faces, making them stand instead of sit until their legs were so weak they could stand no more, spraying Lysol on a child, slamming a disabled child down on a wedge, slamming a disabled child down in his wheel chair, abandoning disabled children restrained to

Rifton chairs while they spread feces on themselves, telling disabled

children their mother did not love them or was on crack or was jacked up,

intentionally frightening and startling the children, slamming them face first

into metal lockers and cement walls, and more.

149.

Garrett and the other students feared Pickens so much, as one para

who witnessed the abuse explained, all the children cowered when Pickens

came at them upset or angry.

150.

Numerous FCSD paras, several teachers, two nurses, a custodian,

therapists, and others at Hopewell, as well as at least one bus driver and a

parent, reported to Merritt and Boyd that Pickens was abusing disabled

children throughout the three school years Pickens was at Hopewell, and

many if not all of these reports were provided directly to Pettes, and she

received reports of abuse by Pickens of disabled children from Hopewell

teachers and para as well.

151.

Merritt and Pettes had numerous discussions about Pickens' abusing

disabled children and so did Pettes and Boyd.  However, when Merritt and

Boyd answered interrogatories in the case filed by Jake Marshall and

pending before the United States District Court for the Northern District of
Georgia, Merritt and Boyd both intentionally failed to disclose any of these
numerous discussions with Pettes when they were directly asked to identify
everyone they talked to about Pickens' abuse or alleged abuse of disabled
children while Pickens was at Hopewell.

152.

Pettes intentionally lied to the GaPSC when she told the GaPSC
investigator Judy Franklin during a taped interview in 2008 that she (Pettes)
did not know about any abuse from November 2004 until the May 2007
incident.

153.

During Pettes' deposition taken in Jake Marshall's case, while under
oath, Pettes admitted that she was repeatedly informed of the reports of
abuse during the time Pickens was at Hopewell and that she also had many
discussions with Boyd and Merritt during the time Pickens was at Hopewell
about Pickens' abuse, as well as had at least three meetings with Boyd and
Pickens about the reports of Pickens' abuse.

154.

Pettes admitted during her deposition taken in Jake Marshall's case
that she discussed Pickens' ongoing abuse of disabled children at Hopewell

with her then FCSD supervisor, Wadel and prior to Wadel, with her FCSD supervisor, Shelley.

<div align="center">155.</div>

From 2004 to 2007 and throughout that time, Pettes discussed many times with Hopewell paras and teachers, Boyd, Pickens, Merritt, and Wadel Pickens' abuse of disabled students.

<div align="center">156.</div>

Pickens apologized for her mistreatment of disabled children at different times to Merritt, Sosebee, White, Boyd, Pettes, Faulkner, Shaffer, Etris, Thompson, Butler, and others, and Pettes never heard Pickens deny the abuse, but instead only heard Pickens apologize and say she would try to do better and that she would try to control her anger.

<div align="center">157.</div>

In November 2004, Pickens admitted hitting and slapping Jake, but lied and alleged she hit and slapped Jake gently.

<div align="center">158.</div>

Pickens admitted in 2008 in an audio taped interview to the GaPSC to passing gas in one or more student's face, shaking her buttocks in a disabled student's face, putting disabled children in rooms alone restrained to a chair

<div align="center">58</div>

with the door closed, and screaming in a child's face (she called it "scream therapy").

159.

Pickens attorneys had a copy of Pickens' taped interview with the GaPSC containing some of Pickens' admissions when they filed, on Pickens' behalf, an answer to a complaint filed by Jake Marshall and pending in federal district court, and Pickens and her counsel denied in Pickens' answer that she ever did any of the abusive acts, including ones Pickens had herself admitted to doing during her taped interview and admitted to doing in writing.

160.

Pickens' counsel had Pickens' oral taped statement to the GaPSC transcribed, and Pickens' attorneys knew when they filed Pickens' answer in Jake Marshall's case that they were filing a pleading denying accusations that Pickens herself had admitted to doing during a taped interview with the GaPSC.

161.

Pickens and her attorneys in Jake Marshall's case had Pickens' tape recorded statement containing Pickens' admissions regarding Pickens shaking her buttocks, passing gas, and screaming in children's faces and

leaving children in rooms alone with the door shut, but Pickens, through her counsel, "vehemently" denied and continues to deny the allegations Pickens earlier admitted to the GaPSC.

162.

There are at least 12 different eye witnesses who have testified under oath to having seen firsthand Pickens abusing, as defined herein, one or more disabled children at Hopewell, including Garrett, and there are additional witnesses who saw the abuse but who have not yet testified.

163.

White, the special education head department chair/lead special education teacher at Hopewell on G Hall, saw Pickens slam Jake Marshall into a wall, push students, give Jake wedgies, and kick Jake, and White informed the GaPSC investigator Judy Franklin that she had "never worked in a school when they basically looked the other way when a teacher was abusing a student and students."

164.

White reported Pickens' abuse to the former department head (Averett) when White first arrived at Hopewell during the 2005-2006 school year, and White also reported Pickens' abuse to Boyd and Merritt.  White, however, knew Pickens' abuse of disabled children continued, and White,

acting in concert with Merritt, Boyd, Thompson, Sosebee, Pettes, Wadel, and other Defendants, never reported Pickens abuse of disabled children to the GaPSC, DFACS, the FCSD police, any other investigative agency, or the parents of the disabled children.

<div align="center">165.</div>

The teaching assistants (paras) at Hopewell were afraid to work with and did not want to work with Pickens because of the way Pickens abused disabled children and because Pickens was called into Boyd's office at times due to her abuse of the disabled children.

<div align="center">166.</div>

Denise Baugh, a para in Pickens' class during the 2006-2007 school year, testified that she witnessed, and in fact she did witness, Pickens burp in disabled children's faces, scream at them, push and shove them, kick them (by leaning back and kicking like Pickens was kicking a ball), push them into lockers face first, scream at children in their faces, press her breasts and buttocks into disabled children's faces, shake her breasts in their faces, pass gas in their faces, and more.  Baugh testified she had never seen a school district allow a teacher to abuse so many children for so long.

167.

While at Hopewell, Pickens abused disabled children every day, and when Pickens was angry, she would take her anger out on almost all of the disabled students in her class by being abusive to them and by excessively and unduly severely punishing them.

168.

When a teacher or para tried to intervene on behalf of a disabled child being abused, Pickens would either angrily or rudely tell that individual to mind her own business or worse, abuse the disabled child or children more.

169.

At times, Pickens' abuse of disabled mentally impaired students was excessive and cruel corporal punishment, done for the purpose of punishing the children for them not doing what Pickens told them to do or otherwise wanted them to do.

170.

Pickens would abuse disabled children, at times, because they did not do their work or else did not finish their work, or because they cried or made noises, or sometimes because they simply did not walk or eat fast enough due to their disabilities.

171.

Due to the Defendants' collective and concerted actions allowing, promoting, and covering up Pickens' abuse and not reporting the abuse, Pickens believed and knew she could continue abusing disabled children, including Garrett, and that it was accepted by the Defendants and that no one was going to stop her from doing so.

172.

Each year Pickens was a Hopewell, Pickens' abuse of disabled children worsened in intensity and frequency, and Boyd, Merritt, White, Thompson, Sosebee, Pettes, Biegelson, McGee, and others continued to be informed of Pickens' abuse but they continued to allow and condone it, for FCSD and its top administration, including but not limited to Denmark, Lynch, Wilson, Wade, Beasley, Shelley, Wadel, Vanairsdale, Reece, and Young, had intentionally and maliciously decided FCSD would and could abuse disabled children who could not report the abuse.

173.

A FCSD special education nurse named Goodman reported Pickens' abuse of disabled children in January 2006 to Defendants White (who said, "We're working on her, you know, on things."), Boyd, and Meadows, and Meadows again reported the abuse to her supervisor and social work

services, but from December 2004 to April 2007, the Defendants ignored the abuse, did not have a social worker investigate Pickens' ongoing abuse, did not take actions against Pickens to dismiss her, did not remove Pickens from continuing to abuse the disabled children, and allowed Pickens to continue to abuse the disabled children, including Garrett.

174.

Goodman reported to Boyd that Pickens told a disabled child his mother was a "crack-head," and she reported again to Boyd when Goodman saw Pickens "jack up" a disabled child, and Pickens in fact did these acts.

175.

Goodman reported to Boyd and others that Pickens told a disabled child that his mother didn't "give a sh_t about" him.

176.

Goodman reported to Boyd and others that Pickens would scream or yell at disabled children in her class and bang the table to intentionally startle them, and the children would flinch.

177.

Goodman saw Pickens talk "nasty" about disabled children's parents to the disabled students, and she reported this to Boyd and others, as well as

the fact that Pickens was placing disabled children, some with serious health issues, alone in a room by themselves.

178.

When Goodman began reporting the abuse Goodman had seen to Boyd, before Goodman ever said Pickens' name, Boyd asked, "Now what has Melanie done?"

179.

After Reddick reported Pickens in 2004 to Boyd and Merritt and her supervisor (Meadows), Boyd did not wish for Reddick to continue teaching at Hopewell, and Reddick transferred to a cluster of schools that did not include Hopewell.

180.

After Reddick reported Pickens' abuse of disabled children, Boyd told Pickens that it was Reddick who had reported Pickens, and after Goodman reported Pickens' abuse of disabled children to Boyd, Boyd told Pickens that Goodman had reported her.

181.

Goodman told Averret that Pickens was too rough with the disabled children, and Averett replied that the administration was well aware of that.

182.

Averret, who was the lead teacher on G Hall for one school year while Garrett was at Hopewell, told both Merritt and Boyd that Pickens was abusing disabled children, but Averret did not report Pickens to the GaPSC, DFACS, the FSCD police, any other criminal investigative agency, or the abused disabled children's parents, and she allowed the abuse to continue.

183.

Goodman told the GaPSC investigator in 2008, after Pickens resigned, that she (Goodman) would not trust Pickens with her four children, all of whom can walk and talk, because Pickens could lose her temper as fast as one can snap her fingers, and this was true of Pickens.

184.

Pickens physically placed and restrained disabled students to chairs in rooms by themselves and would leave them there sometimes for hours, and Pickens did this to Garrett for three school years.

185.

Everyone who was a teacher or a para on G Hall from 2004 to 2007 knew that Pickens physically placed and restrained disabled children to chairs and abandoned them in rooms by themselves, and Boyd, Pettes, Wadel, Butler, Merritt, and others had been informed throughout that time

that Pickens was placing disabled children in rooms restrained to chairs by themselves.

186.

The disabled children abused by Pickens stopped liking to come to school.

187.

All the time when Pickens abused disabled children at Hopewell, Boyd, and at least on one occasion, Thompson, gave Pickens completely positive teacher reviews, as they condoned and covered up Pickens' abuse of disabled children.

188.

The disabled students, including Garrett, whom Pickens abused at Hopewell could not defend themselves and they could not, due to their mental impairment and language disabilities, report to anyone that Pickens was in fact abusing them.

## ABUSE OF GARRETT

189.

Garrett's parents still do not know all of the ways in which Pickens abused Garrett, but they have learned of some of the abuse, and most of

Pickens' abuse of Garrett they learned in the last year from depositions taken in another matter.

190.

Pickens would, on most mornings, physically take Garrett and physically restrain him to a wooden chair and abandon him in a dark room, and this would so upset and scare Garrett, he would scream and cry until he could not scream and cry anymore and he would also hit himself, harming himself, and Pickens was aware Garrett was harming himself when she restrained him alone in a room to a chair.

191.

Garrett began his school morning as stated in paragraph 190 above and he thus never adjusted to Hopewell and instead became increasingly resistant to attending school and afraid of school.

192.

Garrett would scream, cry, kick the wall, and injure himself when Pickens would physically restrain him to a Rifton chair and abandon him in a dark room with the door shut.

193.

Pickens also physically restrained Alexander Williams and Jake Marshall to Rifton chairs and abandoned them in dark rooms, and Jake would also kick and scream when he was so restrained and abandoned.

194.

Pickens at times would use a strap to physically tie Garrett to the chair, and at times she would use a tray to physically restrain him to the chair, and she would even use the tray to physically restrain Garrett's hands and arms in the chair so he could not move them, and then Pickens would leave Garrett for 20 minutes to hours on multiple days, if not every day, physically restrained to a chair in a room by himself.

195.

Pickens physically abused Garrett, and she physically abused other students in her class at Hopewell in front of Garrett, who had to endure Pickens' daily abuse of himself and also witness Pickens' daily abuse of his classmates, all the time wondering when he was going to be her next victim.

196.

More than once, Pickens threw her shoes, usually hard high heels, at Garrett with force and hit him with her shoes.

197.

Pickens cursed and yelled at Garrett and the peers in his class, shook her buttocks in Garrett's face, passed gas in his face, burped in his face, and did other such horrible acts to Garrett over three school years.

198.

Pickens was "all over Garrett," according to one witness, and if Garrett did not do exactly what Pickens wanted the minute she wanted it, Garrett was excessively and unduly severely physically and emotionally punished by Pickens.  For example, in addition to physical restraint, if Garrett was at lunch and trying to calm himself from crying all morning while physically restrained so that he could eat, Pickens would get upset at Garrett and punish him by taking away his food and throwing it in the garbage, depriving Garrett of lunch.

199.

Pickens deprived Garrett and other children of lunch on many occasions to punish them for not eating fast enough, not doing their work, not completing their work, or for doing some other act Pickens did not approve of them doing or not doing some act she insisted they do, and she also deprived Garrett of food when he would be physically restrained to a chair and abandoned.

200.

When Garrett came to school until the minute he left, according to numerous witnesses, he was upset and scared, and he would often cry.

201.

Pickens would scream at Garrett to "shut up," and she would call him names, such as "retard," "stupid," "f_cker," and "little sh_t."

202.

When Pickens would get frustrated with Garrett because he did not do as she wanted him to do, Pickens would be aggressive verbally and physical with Garrett.

203.

Pickens intentionally mocked Garrett after she did something to upset Garrett, and she would physically get in his face and scream at him, which would so upset Garrett, he started back his self injurious behavior of nose pressing and hitting to an extreme, very dangerous intensity and rate (witnesses testified they thought he was going to break his nose).

204.

Pickens would physically push and yank Garrett and scream at him, and he would become upset, and Pickens would then get physically right into Garrett's face and scream at him and act as if she were hitting her nose,

and Garrett would hit his nose even harder.  Teachers and other educators witnessed this, and at least one told Pickens to stop, but Pickens replied rudely that it was her student.

205.

Pickens, as she did to the other students, intentionally upset Garrett, aggravated him, made him cry and scream, and then would punish him for this by physical abuse and other abusive methods, including getting right next to Garrett's ear and screaming very loudly (enough to cause pain) in his ear, which upset Garrett more, and he would scream and cry more and begin to self injure.  Pickens would then scream more and louder in Garrett's ear, and then Garrett would scream and cry more and self injure more.

206.

Pickens berated and belittled Garrett in public, screaming at him, calling him vile names, and screamed to him that he did not need to even go out in public or be in public, physically yanking him around and shoving him.

207.

It was not Garrett who was aggressive; it was Pickens who was mean, abusive, hateful, harmful, and verbally and physically aggressive to Garrett and who excessively and unduly severely physically punished Garrett.

208.

Day after day for three school years, Pickens "paraded" over Garrett and "marched" around him, waiting for him to do anything Pickens did not like and then she was "all over him," screaming and punishing him, physically restraining him to a chair and isolating and abandoning him in a room with the lights out and door shut.

209.

Pickens would strip Garrett's and other children's clothes off of them when she left them in the bathroom.

210.

Pickens was abusive to Garrett when he toileted, as she was to other students, and whatever she did to Garrett and the other children in the bathroom, as well as all the other known abuse, made them lose totally or severely regress in their toileting skills and be afraid of and not want to go to the bathroom.

211.

Garrett would come home from Hopewell when Pickens was his teacher with bruises on his body, and his parents and doctor could not figure out where the bruises were coming from, and Pickens would not write up an incident report or accident report, except the one or few times she did, she

lied in the reports and attributed the injury to an accident when the injury was caused by Pickens' physical abuse.

212.

According to witnesses, Jake Marshall was the most abused by Pickens, followed by either Garrett or Alexander Williams.

213.

According to witnesses, Garrett was either the second most abused disabled child or he would have been had he attended school more.

214.

Garrett's parents trusted the FCSD and Pickens, and in fact, due to prior transitioning, advocated for Garrett to go to Hopewell, for they had no idea that the FCSD would place Garrett in a harmful, abusive placement condoned by the Defendants and then hide and cover up the abuse.

215.

Pickens rubbed and shook her breasts and buttocks in Garrett's and other disabled students' faces.

216.

Each school morning Garrett would be physically abused by Pickens, who would also physically abuse Jake Marshall, Alexander Williams, and Aaron Hatcher.

217.

Pickens is not only a child abuser, she is an abject liar, and she lied to parents, including Garrett's mother, telling the parents, including Garrett's mother, all sorts of lies, including but in no way limited to the lies that the children were making great progress when they were not, were doing things they were not doing, were achieving goals they were not achieving, and were making progress at school when in fact they were not progressing at school but were regressing and were living in constant fear and misery due to Pickens' abuse.

218.

Pickens falsified data sheets for goals and objectives and ones for behavior, statements made in the children's agendas, and at least on one occasion, an incident report.

219.

Pickens would try to make Garrett do things he could not do due to his disabilities, and when Garrett could not do them, Pickens would physically, verbally, and emotionally abuse Garrett and unduly severely and excessively punish Garrett.

220.

On some days, Pickens screamed and physically restrained and otherwise physically abused Garrett and his classmates in front of Garrett all day long.

## SEVERE, LIFE-LONG HARM TO GARRETT

221.

Because Pickens abused and unduly severely and excessively punished Garrett as set forth above, Garrett was severely harmed and injured for life, and because of the abuse, he, inter alia, came home from school with bruises on his body; suffered extreme physical, mental, and emotional harm and stress; started not wanting to go to school at all; started attacking his mom and himself when she would take him onto the school property; started screaming "no, no, no" to not go to school; started getting physically sicker and sicker during the school years; lost verbal and toileting skills; regressed and did not make progress in all areas; started having toileting incidents at school; started kicking walls; started taking off his shoes and throwing them; started back with prior extinguished self injurious behavior worse than it had ever been in the past and never discontinued it; started having seizures and/or rolling his eyes in his head during the school week and on school

days; and starting presenting to some FCSD educators as being afraid to come to school.

222.

Because of the Defendants concerted actions to abuse and unduly severely and excessively punish Garrett and other children in front of Garrett and to cover up these acts from Garrett's parents, Garrett started physically injuring himself and others.

223.

Because of the Defendants concerted actions as set forth herein, Garrett grew more afraid of school and a school environment and would severely harm himself in school.

224.

When Alexander Williams' due process hearing was getting ready to first begin in the Fall of 2011, FCSD moved Hopewell employees to other locations, and one of the results of this sudden move was that subpoenas served to witnesses at Hopewell did not get served, and substantial efforts had to be undertaken to find these important witnesses and have them served.

225.

One of the FCSD employees FCSD moved from Hopewell was Pickens' former para for five years, and when this para was moved in the Fall of 2011 to Roswell High School into Garrett's classroom at that time, when Garrett saw this para, he suffered a severe breakdown and became inconsolable, terrified, upset, and self injurious for days.

226.

When FCSD moved the para referenced in paragraph 225 above to Garrett's classroom, Garrett became out of control, anxious, cried all the time, was self injurious to the worst level ever, and had to be completely removed from the public school setting and his medication increased, taking Garrett more than a week to calm down, and then, after he was finally calmed down, as his mother drove down the street near his FCSD school where Garrett had seen Pickens' para, Garrett again became upset, crying, out of control, self injurious, and anxious.

227.

Because of the actions of the Defendants as set forth in this Complaint and the abuse and excessive and unduly severe corporal punishment Garrett suffered, Garrett has not been allowed by his long-time treating developmental pediatrician to return to school since the Fall of 2011 and has

been placed on homebound since the trigger he suffered in seeing the para as set forth above.

228.

Because of the actions of the Defendants as set forth in this Complaint and the abuse and excessive and unduly severe corporal punishment Garrett suffered, Garrett has post traumatic stress disorder ("PTSD") and events, noises, smells, sounds, loud sounds, and other things will trigger Garrett's anxiety and stress, and he cannot function, will become self injurious, will harm others, and will suffer as others do with severe PTSD.

229.

Because of the actions of the Defendants as set forth in this Complaint and the abuse and excessive and unduly severe corporal punishment Garrett suffered, Garrett was placed on increased medications and to this day requires significant medication to address his anxiety, fears, and stress and his PTSD due to the excessive and unduly severe corporal punishment and abuse he suffered and others suffered in front of him for three years and the cover up of this abuse and punishment from his parents.

230.

When an event, sound, loud noise, smell, or other thing triggers Garrett's PTSD, anxiety, stress, and fears, he will say "no chair, no chair, no

chair" repeatedly and his eyes will roll back in his head.  He will also self injure and injure others and destroy property, even when placed on increased medication.

<p style="text-align:center">231.</p>

Garrett's parents had to know and still have to know what happened to Garrett so they can help their son, but to this date, due to the Defendants' actions to cover up and lie about and hide the abuse and unduly severe and excessive corporal punishment, Garrett's parents still do not know all that happened to Garrett, so they cannot help him.  As of October 2010, Garrett's parents did not know hardly anything that had happened to Garrett at Hopewell due to the FCSD and other Defendants.

<p style="text-align:center"><strong><u>THE FIVE-YEAR ABUSE AND COVER UP</u></strong></p>

<p style="text-align:center">232.</p>

In addition to that set forth above, the Defendants, acting in concert, have intentionally and maliciously taken actions from 2002 to the present time to ensure that the parents of disabled children abused by Pickens, including Garrett's parents, never learned of or at least never fully learned of the abuse of their children, including the abuse of Garrett, and to ensure that the Defendants' conspiracy to abuse and unduly severely and excessively

<p style="text-align:center">80</p>

punish disabled children with mental impairment and cover up was never exposed.

233.

FCSD and other named Defendants, including but in no way limited to Schuette, Kanner, Beasley, Wade, Wilson, Pettes, Wadel, Faulkner, Butler, Tinsley, Biegelson, Merritt, Boyd, and Thompson, have destroyed, deleted, altered, or otherwise not produced documents, including subpoenaed documents, involving Pickens' abuse and unduly severe and excessive physical punishment of disabled children since 2002.

234.

FCSD and Schuette intentionally and willfully failed and refused to even attempt to comply with the subpoena served upon them during the IDEA due process hearing for Alexander Williams.

235.

Schuette willfully and intentionally deleted emails involving Pickens' abuse **after** she was served with a subpoena, and FCSD willfully and intentionally, through its counsel, misrepresented it had provided all responsive documents related to any abuse or reported abuse by Pickens when in fact FCSD did not do so and knew it had not done so and did not even ask certain FCSD employees involved in Pickens' abuse and excessive

and unduly severe corporal punishment of disabled students for the subpoenaed documents.

<div align="center">236.</div>

FCSD and some of its employees, including Schuette, Wade, and Kanner, have intentionally and willfully altered or destroyed documents related to Pickens' abuse and excessive and unduly severe corporal punishment of disabled children, which began in 2002 and lasted until 2007.

<div align="center">237.</div>

Merritt has reported there were emails and documents related to Pickens' abuse of disabled children, but Merritt and FCSD have never provided those emails, even when requested by subpoena, formal discovery, and the Georgia Open Records Act.

<div align="center">238.</div>

FCSD, through its counsel, employees, agents, board members, and/or other representatives, intentionally and willfully altered the investigative report of Pickens conducted by Stan Williams' company (referred to at times as the "Umbarger report" and hereinafter so referred).

<div align="center">239.</div>

FCSD has at least three, if not four or more, versions of the Umbarger report, and FCSD, through its counsel, employees, agents, board members,

<div align="center">82</div>

and/or other representatives, intentionally and willfully altered that investigative report and destroyed or refused to produce at least one taped recorded interview.

240.

Defendant Wade attended Umbarger's interview of Tallant, which was tape recorded, but Wade testified under oath he did not when in fact he did, and that recorded interview has been destroyed or not produced by FCSD.

241.

FCSD, through its counsel, employees, agents, board members, and/or other representatives, has intentionally and willfully not provided numerous and multiple emails involving Pickens' abuse or reported abuse and excessive and unduly severe corporal punishment of disabled children, beginning in 2002 and lasting until 2007.

242.

FCSD, through its counsel, employees, agents, board members, and/or other representatives, has intentionally and willfully not provided numerous and multiple documents involving Pickens' abuse or reported abuse of disabled children, beginning in 2002 and lasting until 2007.

243.

FCSD has at all times until some time after November 1, 2011 failed and/or refused to allow FCSD police to investigate Pickens' abuse of disabled children.

244.

Defendants FCSD, Wade, Wilson, FCSD's legal counsel, and other Defendants, FCSD employees, and FCSD board members, including Schultz, intentionally decided that FCSD police would not and/or would not be allowed to investigate Pickens' abuse of disabled children until after some time after November 1, 2011.

245.

The only reason FCSD, Wade, FCSD legal counsel, other Defendants, and Robert Avossa (the then and current FCSD superintendent and hereinafter referred to as "Avossa"), Schultz, and other FCSD board members allowed FCSD police to investigate in November 2011 or thereafter Pickens' abuse and excessive and unduly severe physical punishment of mentally impaired students is because of the persistent scrutiny and pressure CBS Atlanta (WGCL Television) and one of its reporters, Jeff Chirico (hereinafter referred to as "Chirico"), applied to Paul

Case 1:14-cv-01399-AT   Document 1   Filed 05/08/14   Page 85 of 129

Howard, the Fulton County District Attorney (hereinafter referred to as "Howard").

<div align="center">246.</div>

After CBS Atlanta and Chirico continued to ask Howard and his office why the ongoing abuse of disabled FCSD students had not been and was not being investigated and CBS Atlanta and Chirico continued to report the story and lack of criminal investigation, finally, in November 2011, it was announced the District Attorney's office would investigate the abuse of disabled children by Pickens, but this did not happen.  Instead, Howard reportedly told Wade and/or Avossa that it would be in FCSD's "best interest" to investigate Pickens' abuse of disabled children.

<div align="center">247.</div>

Prior to CBS Atlanta and Chirico's involvement and pressure for a criminal investigation, FCSD, other Defendants named herein, Avossa, Schultz, other board members, FCSD legal counsel, and others refused to allow FCSD police or any other criminal investigative agency to investigate Pickens' abuse of disabled children because FCSD, the named Defendants, and other FCSD employees and board members were all complicit with and in the abuse and unduly severe and excessive corporal punishment of numerous disabled children and its cover up.

<div align="center">85</div>

248.

To FCSD and its then current administration, or some of its then

current administration and board members, doing "damage control" was

much more important than Garrett's parents and the other disabled

children's parents being fully informed as to what happened to their disabled

children so they could help and get help for their children and make

informed decisions.

249.

In 2007, when FCSD hired Stan Williams' company to investigate the

abuse by Pickens of Jake Marshall on one day in May 2007, the

investigative report was provided to Wade and Kanner.

250.

It was Kanner's job in the FCSD to report abuse of one or more

students by an educator to the FCSD police, but Kanner intentionally and

maliciously, at Wade's and FCSD's direction, did not do so.

251.

Kanner was and continues to be a part of the cover up of the abuse

and excessive and unduly severe corporal punishment of disabled children,

and it is FCSD's policy, practice, and custom to not only allow educators to

abuse and unduly severely and excessive physically punish disabled children

who cannot report the acts against them, but to cover it up and not inform authorities of the abuse, unless forced to do so.

251.

To this day, FCSD has never thoroughly investigated the abuse Garrett suffered, and FCSD refuses to cooperate in any way with Garrett's parents in learning of the abuse Garrett suffered so Garrett can be better helped and his parents fully informed to make necessary decisions for him and obtain the proper help for him.

253.

FCSD obtained from the Milton Police Department FCSD's police investigation of the abuse of disabled children by Pickens for use in a due process matter involving Garrett, but it refused to provide that report to Garrett's parents until FCSD introduced that report in a hearing.

254.

All Defendants, acting in concert, have taken numerous intentional actions to ensure Garrett's parents never learned of the abuse Garrett suffered, from withholding, destroying, altering, falsifying, and not producing documents and information about Pickens' abuse and excessive and unduly severe corporal punishment of Garrett and other children to

informing FCSD personnel they cannot disclose the abuse of Garrett or talk about it to Garrett's parents.

255.

The bad faith, willful actions set forth by the Defendants in paragraph 254 above has caused and continues to cause harm to Garrett, as his parents must be fully informed of the abuse Garrett suffered so Garrett can have the proper environment, educational program, medical care, psychological care, and support.

256.

When Jake Marshall's mother began to learn of the abuse of her son and other mentally disabled students at Hopewell, she filed a police report with the FCSD police regarding the abuse Jake had suffered, but Defendants FCSD, Wade, Wilson, and the other Defendants, acting in concert, and FCSD counsel, and upon information and belief, the FCSD board of education members or at least Linda Schultz decided that once again the abuse of disabled children by Pickens would be hidden, covered up, and obscured and that no police investigation would be had.

257.

When Jake's mother filed a police report with the FCSD police regarding Pickens' abuse of Jake and other disabled children, Wade, Wilson,

Mark Muma (the then FCSD director of public safety), FCSD legal counsel,

FCSD, other Defendants named herein, other individuals, and one or more

of the FSCD board members, including Schultz decided that the FCSD

police would not investigate the abuse of disabled children by Pickens.

<div align="center">258.</div>

After Jake Marshall's mother filed a police report with the FCSD

police, Wade; Muma; FCSD counsel; and former chief of FCSD police

Chandi Green, also known as Chandi Ashmore (hereinafter referred to as

"Ashmore"), at the least, all met together, and during that meeting, Wade

told Ashmore that Pickens' abuse of disabled children was not to be

investigated by the FCSD police department even though Jake's mother had

filed a police report regarding Pickens' years of abuse with the FCSD police

department.

<div align="center">259.</div>

At the meeting set forth in paragraph 258 above, Wade told Ashmore

the FCSD police department was to only look into whether the FCSD had

reported the abuse by Pickens of disabled children to the FCSD police.

<div align="center">260.</div>

Having received directions from Wade in the meeting set forth in

paragraphs 258 and 259 above, Ashmore informed FCSD police officer

Felipe Usury (herein after referred to as "Usury") he was to look into
whether the FCSD had reported the abuse by Pickens of disabled children to
the FCSD police and other agencies, and Usury's limited investigation
disclosed that the FCSD had never reported the abuse of disabled children
by Pickens to the police.

261.

Because of the decisions and directions set forth in paragraphs 258 to
260 above, Usury was not given permission to move forward but was instead
told to "ex-clear" the matter after he looked into whether it had been
reported.

262.

"Ex-cleared" means the matter is closed and the file shut without any
further investigation, according to Usury's testimony at the IDEA due
process hearing for Alexander Williams, and this is a correct definition of
"ex-cleared."

263.

Usury testified at the Williams' IDEA due process hearing that
although the statute of limitations had not expired for criminal prosecution,
Usury's superior (Ashmore) told him only to see if the abuse had been
reported, even though Usury was not even the north county police officer,

but was instead the south county police officer, and the matter was a north county police matter.

<div align="center">264.</div>

Pickens should have been investigated and reported to the district attorney and there is no reason to "ex-clear" or close a file simply because the teacher is no longer employed by the FCSD.

<div align="center">265.</div>

Shortly after Usury testified at the Williams' due process hearing and did not reveal during his testimony that Wade and other FCSD administration and its counsel had decided and told Ashmore to ensure the matter was not truly investigated, FCSD, Wade, Schultz, and others made Usury the chief of the FCSD police.

<div align="center">266.</div>

Ashmore had told Usury that she (Ashmore) had been told that there was not to be an investigation of the abuse by Wade and Muma, but Usury did not reveal this during the IDEA hearing.

<div align="center">267.</div>

An unbiased, meaningful criminal investigation has never been conducted to this day and would have revealed the large number of FCSD administrators, board members, and personnel who were actively involved in

allowing Pickens to abuse and unduly severely and excessive physically punish disabled children with moderate, severe, or profound mental impairment and the criminal and civil conspiracy to allow the children to be abused for five years and cover up of that abuse.

<center>268.</center>

FCSD, Wade, Wilson, FCSD's counsel, FCSD's board, and others would not allow and still will not allow those involved in the conspiracy set forth herein to be abused.

<center>269.</center>

To this date, FCSD has held not even one individual accountable for the five years of abuse and unduly severe and excessive corporal punishment of disabled students with mental impairment, except that it finally reported Pickens and Boyd only to the GaPSC and it sent a discharge letter to Boyd, but then allowed her to retire a year after she was to be discharged.

<center>270.</center>

FCSD and its attorneys and others have withheld from Alexander William's, Jake Marshall's, and Garrett's parents their children's education records in order to cover up the abuse and unduly severe and excessive corporal punishment they suffered.

<center>92</center>

271.

Just for FCSD to finally provide some of the tapes of witness statements about some of the abuse, Alexander William's parents had to inform FCSD they were going to file a complaint against the FCSD with the State Attorney General, and they had to have their counsel send repeated requests to FCSD's counsel, and FCSD never provided those tapes to Jake Marshall's or Garrett's parents.

## THE IDEA DUE PROCESS HEARINGS

272.

In August 2009, Jake Marshall's parents requested pursuant to the IDEA a due process hearing request seeking all IDEA remedies allowed by law for, inter alia, the abuse and unduly severe and excessive corporal punishment their child had endured for three years while in Pickens' class, and that matter was settled.

273.

On June 16, 2011, Alexander Williams' parents requested a due process hearing seeking all IDEA remedies allowed by law for, inter alia, the abuse and unduly severe and excessive corporal punishment their child had endured for three years while in Pickens' class, and after an extensive

hearing with numerous witnesses, the ALJ found in favor of Alexander and his parents on all of his IDEA claims.

274.

On May 21, 2013, Garrett Lee and his parents requested pursuant to the IDEA a due process hearing seeking all administrative remedies allowed by law for, inter alia, the abuse and unduly severe and excessive corporal punishment their child had endured for three years while in Pickens' class, and all and only the IDEA issues raised in that hearing request were resolved by settlement.

275.

Garrett has exhausted all administrative remedies allowed by the IDEA prior to filing this lawsuit against the Defendants.

276.

In response to the three IDEA due process hearing requests set forth in paragraphs 272-274 above, FCSD denied doing anything wrong and claimed that each of the boys involved received a free appropriate public education in a proper placement even though FCSD knew they had been horrifically abused and unduly severely and excessively physically punished at Hopewell.

277.

In the IDEA due process hearing for the Williams, the ALJ found that every witness asked about Pickens' conduct toward her disabled students agreed that such was "outrageous" and "appalling," yet FCSD and all Defendants herein knew about that abuse and allowed it without somewhat reporting it until May 2007, when in fact the abuse began in August 2002.

278.

The ALJ in the Williams due process hearing matter accurately found that FCSD allowed Pickens to resign and allowed Boyd to resign (effective June 30, 2008) as a curriculum support analyst, and FCSD in fact did do this.

279.

Boyd never served as a curriculum support analyst for FCSD although FCSD and Boyd represented in writing that she did so that Boyd would receive more beneficial retirement advantages without costs.

280.

FCSD asserted and allowed Boyd to assert Boyd was employed by the FCSD as a curriculum support analyst during the 2007-2008 school year when in fact Boyd never performed any work in that position, and this assertion allowed Boyd to accrue 30 years for retirement.

281.

After Boyd relocated from Atlanta to South Carolina, Boyd submitted to the College of Charleston a document alleging she was a principal with the FCSD at Hopewell until 2008 when in fact that was not so and Boyd knew it was not so.

282.

When Boyd was asked to admit in a civil suit filed by Jake Marshall that she gave to the College of Charleston a writing indicating she was a principal with FCSD until 2008, Boyd objected to admitting in formal discovery she had provided a document for employment purposes to the College of Charleston in which she had not accurately reflected her employment history with the FCSD.

283.

After Jake, through counsel, informed Boyd's counsel a motion would be filed and fees sought due to Boyd's refusal to admit or deny the facts set forth in paragraph 281 above, Boyd admitted that she represented to the College of Charleston that she was a principal until 2008, yet Boyd alleged in formal discovery in response to a request for admissions, that she merely "made a clerical error in her representation that she was employed as Principal by the FCSD in 2008."

284.

In ruling upon the IDEA due process hearing request filed by
Alexander Williams and his parents and the overwhelming evidence
presented during the hearing, the ALJ found, inter alia, that Alexander could
not go home and tell his parents he was being abused at school in the FCSD;
his and his parents procedural IDEA due process rights were violated by the
FCSD, amounting to a denial of a FAPE; Alexander's substantive due
process rights to a FAPE were denied by FCSD; Pickens abused Alexander
during the 2006-2007 school year resulting in long term regression; FCSD
allowed abuse of Alexander and others due to their segregation on G Hall,
with the ALJ finding in writing that "the isolation and restraint of Alex, Jake
M., and other students in empty, dark rooms on G Hall was not dissimilar to
the warehousing of disabled students in the 1970s, in its worse form."

285.

The ALJ in the Williams' due process hearing matter properly found
that "based on a preponderance of the evidence, that Alex's placement in
Picken[]s'classroom was inappropriate, that Alex was physically and
psychologically abused by Pickens during the 2006-2007 school year, and
that such abuse has had a lasting effect on his progress in school.

Accordingly, Alex is entitled to compensatory education and services under IDEA."

<center>286.</center>

The ALJ also found that FCSD's "physical segregation of the mostly non-verbal disabled students to G Hall allowed the abuse to go unnoticed by others in the school community - such as parents and other regular education students - whose jobs were not dependent on Boyd's favor and who might have more readily complained of Pickens' misconduct."

<center>**COUNT ONE**</center>

<center>**EXCESSIVE AND UNDULY SEVERE CORPORAL PUNISHMENT**</center>

<center>287.</center>

Plaintiffs incorporate by reference paragraphs 1-33 (sets forth parties and their relationships), 190-200, 202-214, 217, 219, 221-231 above as if fully set forth herein.

<center>288.</center>

Pickens actions to Garrett as set forth in paragraphs 190-200, 202-214, 217, 219, 221-231 above amount to excessive and unduly severe corporal punishment, as Pickens unduly severely and excessively physically punished Garrett when he did not do as Pickens demanded or required or when he did something Pickens did not approve of, such as, but not limited to, Garrett not

<center>98</center>

completing his work, Garrett not staying on task to his work, Garrett not

doing his work fast enough, Garrett not eating, Garrett not eating fast

enough, Garrett touching something Pickens did not want him to touch,

Garrett not following directions, Garrett not moving fast enough, Garrett

getting upset, and Garrett crying.

289.

All Defendants owed a duty of care to Garrett to protect him from

harm when he attended Hopewell.

290.

All Defendants acted in loco parentis as to Garrett.

291.

All  Defendants herein were mandated reporters of child abuse

pursuant to O.C.G.A. § 19-7-5.

292.

All Defendants herein were prohibited from committing any act of

child abuse, including any physical and verbal abuse of a child; committing

any act of cruelty to a child or any act of child endangerment; committing

any sexual act with a student; and engaging in harassment of or misconduct

toward any student pursuant to Rule 505-6-.01 (3) (b) (1-4) of the Georgia

Code of Ethics for Educators.

293.

All Defendants herein were required pursuant to Rule 505-6-.01 (3) (i) of the Georgia Code of Ethics for Educators to report any child abuse pursuant to O.C.G.A. § 19-7-5 and to report any violation of the Georgia Code of Ethics for Educators.

294.

At the time Garrett suffered the unduly severe and excessive corporal punishment set forth in this Complaint, FCSD stated that its policy was not to allow any physical punishment of any student, but FCSD had an unwritten policy, procedure, and custom of allowing teachers, at the least Pickens, to abuse and unduly severely and excessively physically punish disabled students, including Garrett, as they could not inform their parents or others of the actions taken against them by Pickens.

295.

At the time Garrett suffered the unduly severe and excessive corporal punishment set forth in this Complaint, Pickens did not punish Garrett for what she considered his misbehavior in front of the principal, assistant principal, or one of their designees, and the one or more of the Defendants knew this.

296.

At the time the other disabled children in Pickens' classes suffered the unduly severe and excessive corporal punishment set forth in this Complaint, Pickens did not punish those children for what she considered their misbehavior in front of the principal, assistant principal, or one of their designees, and one or more of the Defendants knew this.

297.

At the time Garrett suffered the unduly severe and excessive corporal punishment set forth in this Complaint, Pickens did not inform the principal, assistant principal, or one of their designees before the punishment of Garrett, and one or more of the Defendants knew this.

298.

At the time the students other than Garrett suffered the unduly severe and excessive corporal punishment set forth in this Complaint, Pickens did not inform the principal, assistant principal, or one of their designees before the punishment of the students, and one or more of the Defendants knew this.

299.

The Defendants have acted in concert to allow, promote, facilitate, condone, not report, and cover up the unduly severe and excessive corporal

punishment of Jake and the other students Pickens abused as set forth in the Complaint, and as such, they are all liable for the acts of each Defendant.

300.

The Defendants, acting in concert, took intentional, malicious acts and inactions to not comply with the Georgia Code of Ethics for Educators, statutory law, or both and their duty of care and they, acting in concert, allowed, promoted, facilitated, made possible, and covered up Pickens' abuse and unduly severe and excessive corporal punishment of Garrett as set forth herein, thereby causing Garrett to suffer significant injury and damage.

301.

The Defendants, acting in concert, were required by law to share with Garrett's parents information necessary for them to participate in the decision making process regarding their son's education, services, programming, and placement, but no Defendant did this, resulting in Garrett suffering for three school years excessive, cruel, and unduly severe corporal punishment, causing Garrett severe injury and harm, including but not limited to that set forth in paragraphs 221-231.

302.

All Defendants herein conspired and took actions to allow, promote, ensure, facilitate, make possible, and cover up the excessive, bad faith, cruel,

and unduly severe corporal punishment of disabled children with moderate, severe, or profound mental impairment, including Garrett, causing Garrett extreme and lifelong harm.

303.

The Defendants herein had a duty to protect Garrett and not place him with a teacher it knew would abuse him and excessively and unduly severely punish him, but Defendants instead intentionally, willfully, and maliciously conspired and took acts to ensure Garrett was unduly severely and excessively physically punished for three school years and to cover up and hide this unduly severe and excessive physical punishment.

304.

The Defendants herein, by allowing, promoting, ensuring, covering up, not reporting, and not disclosing Pickens' abuse and unduly severe and excessive physical punishment of disabled students for five years acted in concert with Pickens to unduly severely and excessively physically punish Garrett and other students, and all Defendants did so maliciously and intentionally.

305.

The conspiracy all Defendants took part in was, in part, to excessively and unduly severely in bad faith physically punish for years disabled

children with moderate, severe, or profound mental impairment who could not report the abuse they were suffering at school, including Garrett.

306.

Defendants' excessive and unduly severe, bad faith corporal punishment of Garrett and other disabled mentally impaired students was done in violation of clear law, including O.C.G.A. § 20-2-731, for Garrett was punished excessively, unduly severely, outside his IEP.

307.

Pickens and no other Defendant acted in good faith in allowing Pickens to abuse Garrett through excessive and unduly severe corporal punishment.

308.

It was excessive, cruel, unreasonable, abusive and unduly severe on its face for Pickens to have done the acts set forth in the Complaint to Garrett, and having acted in concert with Pickens, each Defendant herein is liable for the harm and damages Garrett has suffered as if each Defendant had himself or herself excessively and unduly severely punished Garrett.

309.

Because of the Defendants' concerted actions, Garrett has been caused severe harm and damages and is entitled to recover for said damages and harm against each and every Defendant.

## COUNTS TWO-FOUR

## INTENTIONAL, MALICIOUS, WILLFUL PHYSICAL ASSAULT, PHYSICAL BATTERY, AND PHYSICAL ABUSE

310.

Plaintiffs incorporate by reference paragraphs 1-33 (sets forth parties and their relationships) and 190-200, 202-214, 215, 217, 219, 221-231, 288-294, 300-307 as if fully set forth herein.

311.

All Defendants, acting in concert, intentionally, willfully, and maliciously in violation of clear law physically assaulted Garrett through their conspiracy and Pickens' part of that conspiracy, including but not limited to Pickens' pushing, shoving, jerking, and yanking Garrett; throwing shoes at Garrett, doing acts to Garrett to cause him to suffer bruises on his body; physically restraining his body and at times his body, hands, and arms to a wooden chair and abandoning him in a room by himself; and other acts set forth herein.

312.

The actions and inactions of all Defendants acting in concert intentionally, willfully, and maliciously in violation of clear law also was child abuse and battery of Garrett.

313.

Because of the Defendants' assault, battery, and child abuse of Garrett, Garrett has been caused severe harm and damages and is entitled to recover for said damages and harm from all Defendants.

## COUNT FIVE

## INTENTIONAL, MALICIOUS, WILLFUL SEXUAL ABUSE

314.

Plaintiffs incorporate by reference paragraphs 1-33 (parties and their relationships), 148, 166, 197, 209, 215, 316, 221-231, 288-294, and 300-307 as if fully set forth herein.

315.

Through the conspiracy and actions taken by all Defendants to allow, cover up, not report, condone, and not disclose Pickens' sexual abuse of her male disabled students, including Garrett, Pickens rubbed her breasts and buttocks in Garrett's and other male students' faces and shook and rubbed her breasts and buttocks in Garrett's and other male students' faces, and this

amounts to malicious, intentional, willful sexual abuse for which Garrett is entitled to recovery from all Defendants.

316.

Pickens did not rub and shake her breasts and buttocks in female students' faces and she did not allow female students to touch her buttocks, but she did do one or more of these acts to her male students, including to Garrett so as to entice Garrett and the other male students, to act indecently toward them, and to sexually arouse herself, Garrett, or both.

317.

Because of the Defendants' concerted actions to sexually abuse Garrett, Garrett has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNT SIX

## INTENTIONAL, MALICIOUS, WILLFUL

## DEPRIVATION OF A MINOR

318.

Plaintiffs incorporate by reference paragraphs 1-33 (parties and relationships), 190-231, 288-294, and 300-307 as if set forth herein.

319.

Through the conspiracy and actions taken by all Defendants to allow, facilitate, cover up, make possible, not report, and not disclose Pickens' abuse of disabled children and deprivation to disabled children, including Garrett, Defendants deprived Garrett of his education, food, physical safety, emotional well being, and proper adult care and control and this amounts to malicious, intentional, willful sexual abuse for which Garrett is entitled to recovery from Defendants.

320.

Because of the Defendants' actions, Garrett has been caused severe harm and damages due to the willful and intentional deprivation Defendants, acting in concert, caused him, and he is entitled to recover for said damages and harm.

## COUNTS SEVEN-NINE

## INTENTIONAL, MALICIOUS, WILLFUL ABANDONMENT, UNLAWFUL CONFINEMENT, AND FALSE IMPRISONMENT

321.

Plaintiffs incorporate by reference paragraphs 1-33, 190-200, 202-214, 217, 219, 221-231, 288-294, and 300-307as if fully set forth herein.

322.

Through the conspiracy and actions taken by all Defendants jointly to allow, facilitate, cover up, not report, make possible, and not disclose Pickens' abuse of disabled children and unlawful confinement and false imprisonment of disabled children, including Garrett, Garrett was restrained to a Rifton chair and abandoned in a room or storage closet bathroom for hours at a time.

323.

At times, Garrett was left in the dark, and the rooms did not have windows, and he could not remove himself from the chair he was physically restrained in or the rooms, where he was abandoned for hours on multiple days if not every day of the school year, and this has caused Garrett severe trauma and harm as set forth herein for which he is entitled to recover from all individual Defendants.

324.

Physically restraining Garrett to Rifton chairs and abandoning him in rooms violated Garrett's personal liberty, an it was not safe for Garrett to be physically restrained to a chair and to be abandoned in a room by himself due to his disabilities, and this caused Garrett extreme fear, anxiety, trauma, injury, and muscle atrophy.

325.

Garrett, due to his disabilities, required and requires adult assistance, and he could not obtain such necessary assistance while physically restrained to a chair abandoned in a room.

326.

Because of the Defendants' collective and concerted actions and inactions set forth herein, Garrett has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNT TEN

## INTENTIONAL, MALICIOUS, WILLFUL

## INFLICTION OF EMOTIONAL DISTRESS

327.

Plaintiffs incorporate by reference paragraphs 1-33, 189-231, 288-294, and 300-307 as if fully set forth herein.

328.

Through the conspiracy and actions taken by all Defendants to allow, facilitate, cover up, not report, and not disclose Pickens' physical, verbal, sexual, and emotional abuse of disabled children, including Garrett and Pickens' intentional, malicious, and willful infliction of emotional distress to disabled children, including Garrett, Garrett suffered severe harm and

emotional distress, trauma, and damages for which he is entitled to recover from all individual Defendants.

329.

Defendants, through a conspiracy to abuse and harm emotionally and physically disabled children with moderate, severe, or profound mental impairment, including Garrett, acted intentionally and recklessly and their conduct was extreme and outrageous and were the direct cause of Garrett's severe emotional harm, distress, PTSD, fear, and anxiety, and Garrett to this day continues to suffer from the intentional and willful emotional distress the Defendants caused him.

330.

Because of the Defendants' collective and concerted actions and inactions, Garrett has been caused intentionally emotional distress resulting in severe harm and damages, and is he entitled to recover for said damages and harm.

## COUNT ELEVEN

## INTENTIONAL, MALICIOUS, WILLFUL CRUELTY TO A CHILD

331.

Plaintiffs incorporate by reference paragraphs 1-33, 190-231, 288-294, and 300-307 above as if they were fully set forth herein.

332.

Through the conspiracy and actions taken by all Defendants as set forth in paragraphs 36-271 to allow, facilitate, cover up, not report, and not disclose Pickens' physical, verbal, sexual, and emotional abuse of disabled children, including Garrett, Garrett was intentionally treated cruelly for three entire school years, and this has directly caused Garrett severe harm, emotional distress, trauma, and damages for which he is entitled to recover.

333.

Garrett has PTSD directly caused by the Defendants' child cruelty and abuse to Garrett, and even with medication and many others supports and even with being removed from the FCSD setting, Garrett has been severely and irreparably harmed due to the Defendants' intentional child cruelty to Garrett.

334.

Because of the Defendants' intentional cruelty to Garrett, he has been caused severe harm and damages and is entitled to recover for said damages and harm.

## COUNTS TWELVE-THIRTEEN

## VIOLATION OF 42 U.S.C. § 1983

## DENIAL OF U.S. CONSTITUTIONAL FOURTH AMENDMENT RIGHT AND GEORGIA CONSTITUTIONAL RIGHT TO BE FREE FROM UNREASONABLE SEIZURE

335.

Plaintiffs incorporate by reference paragraphs 1-33, 189-231, 288-294, and 300-307 above as if they were fully set forth herein.

336.

The Fourth Amendment of the United States Constitution and Article I, Section I, Paragraph XIII of the Constitution of the State of Georgia apply in the school environment, and the concerted acts of all Defendants as set forth herein amounted to intentional and willful unreasonable seizures of Garrett, causing severe harm and damages to Garrett, for which he is entitled to recovery.

337.

Because Defendants acted in concert as set forth in paragraphs 36-271 and because FCSD administrators, including but not limited to Boyd, Merritt, Pettes, Wadel, Shelley, Beasley, Denmark, Lynch, Thompson, Biegelson, Ware, Young, Reece, Faulkner, and Wade acted together to deny

Garrett's right to be free from unreasonable seizures, Garrett was severely, irreparably harmed and damaged and is entitled to recover his damages from all Defendants.

338.

Garrett was a disabled child, and for three school years he was physically, mentally, emotionally, and verbally abused; physically assaulted; physically restrained; abandoned; sexually abused; excessively and unduly severely physically punished; intentionally caused emotional distress; and otherwise harmed as set forth herein by the Defendants acting in concert.

339.

Garrett was a disabled child with mental impairment, and he could not defend himself, did not abuse his educators or classmates, tried to please, and liked school before he was so violently and repeatedly abused by a FCSD teacher who FCSD administrators allowed to abuse Garrett, ratifying, accepting, adopting, condoning, and covering up the abuse.

340.

Given Garrett's age; his disabilities; his nature; the repeated, constant, and daily abuse he suffered; and all Defendants' concerted actions to willfully and intentionally abuse disabled children, including Garrett, under color of state law, custom, policy, and practice, Defendants' actions

deprived Garrett of his Fourth Amendment rights under the United States Constitution.

341.

In abusing and harming Garrett severely for three school years, all Defendants were acting under color of state law, as FCSD was a local educational agency empowered by the Georgia constitution and Georgia statutory law, and the administrators and educators were acting under color of those laws and other statutory laws of the State of Georgia, including but not limited to O.C.G.A. §§ 20-2-738, 20-2-731, 20-2-101, 20-2-214.

342.

While acting under color of state laws, instead of creating a culture of safety, learning, human decency, and respect, all Defendants herein created and maintained for years a horrific, brutal, corrupt culture of concerted sadistic abuse and excessive and intolerable punishment of disabled children with moderate, severe, or profound mental impairment, including Garrett.

343.

Garrett, due to his disabilities and their severity and his vulnerability and defenselessness, was entitled to heightened protections, yet all Defendants acted in concert to repeatedly, intentionally, and willfully abuse and excessively and unduly severely punish Garrett for a prolonged period

of time, and Garrett is therefore entitled under the Fourth Amendment of the United States Constitution to recover all of his damages from all Defendants, in an amount to be determined by a jury and in excess of $100,000,000.

344.

Garrett, a happy, severely disabled child, who sought to please and who, before the abuse, had grown to love school, suffered severely and will never recover from three years of horror he suffered at Hopewell, and FCSD and other Defendants named herein as set forth above, placed Garrett knowingly and maliciously in that setting so he could and would be abused and denied his constitutional rights.

345.

Acting under state law, as set forth in this Complaint, all Defendants denied Garrett of his Fourth Amendment United States Constitutional right, thereby causing Garrett severe and lifelong harm, and he is entitled to recover all damages allowed by law.

## **COUNTS FOURTEEN - FIFTEEN**

## **VIOLATION OF 42 U.S.C. § 1983**

## **DENIAL OF U.S. CONSTITUTIONAL RIGHT AND**

## **GEORGIA CONSTITUONAL RIGHT TO DUE PROCESS**

346.

Plaintiffs incorporate by reference paragraphs 1-33, 189-271, 337-339, 341-342, 288-294, 300-307, and 344 above as if they were fully set forth herein.

347.

Defendants' use of corporal punishment with Garrett was so excessive and unreasonable and Defendants' prolonged, brutal abuse of Garrett was so malicious and sadistic, Defendants, acting in concert as set forth in paragraphs 36-188 and 232-271and under state law, violated Garrett's substantive due process rights under the Fourteenth Amendment of the United States Constitution and his due process rights under Article I, Section I, Paragraph I of the Constitution of the State of Georgia.

348.

Defendants' actions were a concerted custom, policy, and practice designed to and very sadly effective to severely abuse for a five-year period disabled children who could not, because of their moderate, severe, or profound mental impairment, tell others they were being abused, and Garrett was one of those children so abused.

349.

This is not a case where Garrett was abused just a few times or subjected to excessive and unduly severe corporal punishment just once or twice, nor is it a case where Garrett was exposed to traditional applications of reasonable corporal punishment.

350.

The facts set forth in this Complaint and the actions and inactions the Defendants collectively took to ensure, promote, facilitate, and cover up the abuse of Garrett and the other disabled children reveal and amount to a conscience shocking custom, policy, and practice by Defendants acting under color of state law for five long years, where all Defendants took actions and inactions to allow, ensure, promote, and cover up the sadistic, malicious, arbitrary, and conscience shocking, in a constitutional way, ongoing abuse of disabled children with moderate, severe, or profound mental impairment, including Garrett.

351.

This is also not a case where any force or abuse was even necessary, but instead the Defendants acting collectively as set forth herein promoted, sanctioned, covered up, and ratified abuse of multiple significantly disabled children, including Garrett, and worse, acting in concert, the Defendants

placed Garrett knowingly and willfully in that abusive, brutal environment to be viciously and ruthlessly harmed, causing him a deprivation of his due process rights, and as such, Garrett is entitled to recover all damages allowed by law due to the severe and lifelong harm he has been caused.

352.

Society and the laws of the State of Georgia and the United States cannot tolerate a corrupt government educational agency that fosters, allows, sanctions, and covers up and hides abuse of significantly disabled children who cannot protect themselves and who cannot report the harm they suffer at school, and disabled children, including Garrett, who are among our most vulnerable and helpless citizens.

353.

Defendants' concerted and collective actions and their intentional and malicious custom, policy, and practice in allowing Pickens to abuse and continue to abuse disabled children for five years and in allowing helpless children such as Garrett to be placed in such an abusive, harmful setting is arbitrary, capricious, wholly unrelated to any legitimate purpose, and conscience shocking under the United States and Georgia constitutions, and Garrett is entitled to recover all of his damages, in an amount in excess of $100,000,000 to be determined by a jury.

## COUNTS SIXTEEN-SEVENTEEN

## VIOLATION OF 42 U.S.C. § 1983

## VIOLATION OF U.S. CONSTITUTIONAL AND GEORGIA

## CONSTITUTIONAL RIGHTS TO EQUAL PROTECTION

354.

Plaintiffs incorporate by reference paragraphs 1-33, 189-231, 288-294, 300-307, 337-339, 341-342, and 344 above as if they were fully set forth herein.

355.

All Defendants intentionally, willfully, maliciously, and collectively undertook actions and inactions while acting in concert and under color of state law to deprive Garrett of his rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution and Article I, Section I, Paragraph II of the Georgia Constitution.

356.

All Defendants intentionally, willfully, and maliciously undertook actions and inactions while acting in concert and under color of state law to deprive Garrett, due to his moderate mental impairment and resulting inability to report the child abuse he was forced to suffer for three school years a safe, non-abusive education and learning experience as well as to be

afforded his constitutional rights to due process and be free from
unreasonable seizure.

357.

All Defendants deprived Garrett of his rights to equal protection of the
laws for no legitimate purpose, and there was absolutely no rational basis for
depriving Garrett of a safe educational environment and his state statutory
and constitutional rights because he was a child with mental impairment who
could not inform others of the severe abuse Defendants subjected Garrett to
for three school years.

358.

All Defendants deprived Garrett's rights to equal protection of the
laws with a purposeful and malicious discriminatory intent.

359.

Because Garrett was so disabled he could not report the severe and
prolonged abuse he suffered, all Defendants intentionally and maliciously,
acting in concert and under color of state law, abused and excessively and
unduly severely physically punished him.

360.

Had Susan Tallant not insisted someone address the horrific,
conscious shocking, intentional abuse of disabled children, including

Garrett, in the FCSD, all Defendants would have continued to act in concert to allow and promote that shocking and severe abuse, as they had, acting in concert, for five years.

361.

Because Defendants, acting in concert, intentionally and willfully denied Garrett his rights to equal protection of the laws pursuant to the United States and Georgia constitutions, Garrett is entitled to recover all of his damages, in an amount in excess of $100,000,000 to be determined by a jury.

## COUNTS EIGHTEEN-NINETEEN

## VIOLATIONS OF GARRETT'S ADA AND SECTION 504 RIGHTS

362.

Plaintiffs incorporate by reference paragraphs 1-33, 189-231, 288-294, 300-307, 337-339, 341-342, and 344 above as if they were fully set forth herein.

363.

When FCSD placed Garrett at Hopewell during the 2004-2005, 2005-2006, and 2006-2007 school years, he was entitled to the protections of Title II of the Americans with Disabilities Act of 1990 (hereinafter referred to as the "ADA") prohibiting any public entity, including any state or local

government and those acting in concert therewith, from denying him the benefits of the services, programs, or activities of the public entity based upon his disabilities.

<div align="center">364.</div>

Garrett, from 2004-2007 in the FCSD was also entitled under the ADA not to be subjected to discrimination by reason of his disabilities.

<div align="center">365.</div>

When Garrett was at Hopewell from 2004-2007, he was entitled to the protections of Section 504 of the Rehabilitation Act of 1973 (hereinafter referred to as "Section 504") prohibiting any public entity, including any state or local government and those acting in concert therewith, from denying him the benefits of the services, programs, or activities of the public entity based upon his disabilities.

<div align="center">366.</div>

Garrett was also entitled when he was at Hopewell from 2004-2007 under Section 504 not to be subjected to discrimination by reason of his disabilities.

<div align="center">367.</div>

Garrett is and was from 2004 to 2007 a qualified individual within the meaning of the ADA and Section 504 with respect to the benefits, services,

programs, and activities of the FCSD and his educational setting at Hopewell.

368.

Garrett's disabilities substantially limit Garrett's major life activities, including but not limited to caring for himself, daily living skills, performance of manual tasks, walking, speaking, learning, working, and mental processes.

369.

By the intentional, malicious, and concerted acts and failures to act of all Defendants as set forth above in this Complaint, all Defendants, acting in concert, have denied Garrett access to the same benefits of the services, programs, and activities based solely upon his disabilities and have discriminated against him based solely upon his disability.

370.

Solely based upon Garrett's disabilities, all Defendants, acting in concert, maliciously, intentionally, and willfully denied Garrett a public education free from abuse, excessive and unduly severe corporal punishment, and one free from a denial of his constitutional and statutory rights.

371.

Because of all Defendant's concerted and intentional, willful, and malicious acts to deny Garrett his rights under the ADA and Section 504 and their intentional, willful, and malicious discrimination of Garrett based solely upon his disabilities, Garrett has been severely harmed for life, and he is entitled to an award of damages in excess of $100,000,000, as determined by a jury.

372.

Non-disabled students and disabled students who did not have moderate, severe, or profound mental impairment and could not go home and report abuse in the FCSD, were not deprived by the Defendants, acting in concert, of their rights to the same services, programs, and activities, but Garrett, because he was in fact a child with a moderate mental impairment who could not report the abuse and excessive and unduly severe corporal punishment set forth herein, was discriminated against intentionally and willfully by all Defendants herein because of that fact.

## COUNTS TWENTY-TWENTY-ONE

## VIOLATION OF 42 U.S.C. § 1983

## VIOLATIONS OF U.S. AND GEORGIA CONSTITUTIONAL RIGHTS TO BE FREE FROM CRUEL AND EXCESSIVE PUNISHMENT

373.

Plaintiffs incorporate by reference paragraphs 1-33, 189-231, 288-294, 300-307, 337-339, 341-342, and 344 above as if they were fully set forth herein.

374.

Defendants, acting in concert, and as set forth above, undertook malicious, intentional, and willful acts and inaction to cruelly and excessively punish Garrett in violation of his Eighth Amendment United States Constitutional right to be free from such cruel and excessive punishment and Garrett's right to be free from cruel and unusual punishment under Article I, Section I, Paragraph XVII of the Georgia Constitution.

375.

Because of Defendants' acts as set forth herein, Garrett was severely abused and harmed for life, and he is entitled to recover all damages allowed by law in an amount to exceed $100,000,000.

## COUNTS TWENTY-TWO-TWENTY-THREE

## DEFENDANTS NAMED HEREIN

## NEGLIGENT HIRING AND RETENTION

## AND RESPONDEAT SUPERIOR LIABILIY

376.

Plaintiffs incorporate by reference paragraphs 1-33, 189-231, 288-294, 300-307, 337-339, 341-342, and 344 above as if they were fully set forth herein.

377.

Defendants FCSD, Boyd, Merritt, Denmark, Lynch, Wilson, Wade, Beasley, Thompson, Wadel, Pettes, Shelley, Shaffer, Vanairsdale, Reece, Young, Ware, and Biegelson, acting in concert, and as set forth herein, undertook malicious, intentional, and willful acts to hire and retain Pickens and all other Defendants, acting in concert, allowed, promoted, facilitated, endorsed, and ratified, furthered, and covered up their violations of the law and their concerted abuse of disabled children for a five year period, ensuring Garrett was horribly abused and harmed for life as set forth above.

378.

All the Defendants named in paragraph 377 above were supervisors and they all participated intentionally and willfully and/or knew about the legal and ethical violations of their subordinates, and they failed to act to prevent them, and instead, they actually allowed, promoted, and participated in them as a matter of policy, custom, and practice.

379.

All the Defendants named in paragraph 377 above were supervisors and they all participated intentionally and willfully and/or knew about the fact their subordinates were not trained to do their jobs and follow the law, yet they did not train them to do so or discharge them nor report them to the board but instead participated with them in the violation of the law, and instead they actually allowed and promoted their subordinates to violate the law and disabled children's rights, including the rights of Garrett, and refused intentionally and willfully to do their jobs and follow the law as a matter of policy, custom, and practice.

380.

For the reasons set forth herein, the Defendants named herein are liable to Garrett for the severe harm and irreparable damage he suffered in an amount in excess of $100,000,000, to be determined by a jury.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Garrett Mason Lee requests

That this Court exercise jurisdiction over Plaintiff's claims;

That Plaintiff be allowed a jury trial on all causes of action contained herein;

That judgment be entered in favor of Plaintiff and against all Defendants jointly and severally for all damages Plaintiff has incurred;

That Plaintiff recover all attorneys' fees and litigation expenses and costs associated with this action; and

That this Court issue such other relief as may be just, equitable, and appropriate.

This 8st day of May 2014.

 /s/ *Chris E. Vance*
Chris E. Vance
Ga. Bar No. 724199
Counsel for Plaintiff

**CHRIS E. VANCE, P.C.**
Suite 100
2415 Oak Grove Valley Road
Atlanta, GA 30345
Tel:  (404) 320-6672
Fax: (404) 320-3412
Email:  chris@chrisvancepc.com